Receipt number AUSFCC-8430990

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### BID PROTEST

PERCIPIENT.AI, INC.,

      Plaintiff,

  v.

UNITED STATES OF AMERICA,

      Defendant.

Case No. _____ 23-28 C _____

## **COMPLAINT**

Hamish P.M. Hume
Samuel C. Kaplan
Eric J. Maurer
Gina A. Rossman
BOIES SCHILLER FLEXNER LLP
1401 New York Ave., NW
Washington, DC 20005
(202) 237-2727 (t)
(202) 237-6131 (f)

*Counsel for Plaintiff Percipient.ai, Inc.*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................. 1

PARTIES ............................................................................................................. 9

JURISDICTION .................................................................................................. 10

FACTUAL ALLEGATIONS ............................................................................... 11

I.    The Law Requires Government Agencies And Their Contractors To Meet
      Procurement Needs By Acquiring Nondevelopmental Items "To The
      Maximum Extent Practicable," Rather Than By Engaging In Wasteful And
      Inefficient Development Projects. ................................................................ 11

      A.    10 U.S.C. § 3453 requires agencies and their contractors to procure
            nondevelopmental items "to the maximum extent practicable" and to
            conduct market research necessary to determine the practicability of
            acquiring such items to meet agency requirements. ........................... 11

      B.    More recent statutes, regulations, and reports have emphasized the
            importance of acquiring nondevelopmental items in the areas of
            software and artificial intelligence technology. ............................... 15

II.   NGA's SAFFIRE Procurement Seeks Both An Enterprise Repository And An
      Advanced Computer Vision System ("CV System"). ................................. 20

III.  Percipient's CV Platform (Mirage) Meets And Exceeds SAFFIRE's
      Requirements For A CV System.................................................................. 23

IV.   In Violation Of 10 U.S.C. § 3453 And Related Laws, NGA Has Failed To
      Ensure That Percipient's Mirage Is Allowed To Compete To Satisfy The CV
      System Requirements Of SAFFIRE. .......................................................... 30

      A.    Percipient relied on NGA's public statements professing its
            commitment to acquiring technology developed by the private sector
            to meet its requirements, which the SAFFIRE solicitation said the
            awardee would be required to do. ..................................................... 31

      B.    Between the SAFFIRE solicitation and the award, CACI and NGA
            headquarters thwarted the deployment of Mirage in NGA's top secret
            environment. ................................................................................... 33

      C.    Following the award of the SAFFIRE contract to CACI, NGA
            represented that CACI would evaluate commercial and
            nondevelopmental items prior to developing any new software to meet
            SAFFIRE's requirements.................................................................. 34

i

D.  CACI has repeatedly failed to conduct the necessary evaluation to determine Mirage's ability to meet SAFFIRE's CV System requirements ................................................................................ 40

E.  After CACI representatives informed Percipient that CACI intended to build a new CV System as a developmental project, NGA's Associate Director of Capabilities agreed to a demo of Mirage while asking Percipient to "ease up on the legal pressure." .................................................. 42

F.  Following the Mirage demo, NGA's Associate Director of Capabilities acknowledged that Mirage "meets all of NGA's analytic transformation requirements" and committed to conducting a fuller evaluation of its capabilities ............................................................................ 43

G.  After Percipient devoted more than $1 million in time and resources to the effort, NGA and CACI failed to evaluate Mirage's ability to meet SAFFIRE's CV System requirements, and declined to conduct any further evaluation. ........................................................................... 45

H.  In January 2023, NGA confirmed that it had no intention of requiring CACI to license Mirage or other commercial or nondevelopmental items, or to conduct any evaluation necessary to determine the ability of such items to meet SAFFIRE's CV System requirements. ........................ 51

COUNT ONE ................................................................................................. 58

COUNT TWO ................................................................................................. 60

COUNT THREE ............................................................................................. 62

COUNT FOUR ............................................................................................... 63

PRAYER FOR RELIEF ................................................................................. 66

Percipient.ai, Inc. ("Percipient"), for its Complaint against the United States of America,

acting through the Department of Defense's National Geospatial-Intelligence Agency ("NGA"),

alleges as follows.

## INTRODUCTION

1.     Pursuant to 28 U.S.C. § 1491(b)(1), Percipient asks this Court to enjoin NGA's

violation of its obligations under 10 U.S.C. § 3453.  Among other things, § 3453 requires NGA

to ensure that its prime contractors conduct market research to determine if commercial or

nondevelopmental items are available that can meet the agency's requirements, and to procure

such items to meet those requirements "to the maximum extent practicable."  10 U.S.C. §

3453(b)(2), (c)(5).  A commercial item is a product that already exists in the commercial

marketplace and that can be purchased on a fixed-price basis, either with or without minor

modifications as needed for the governmental procurement.  48 CFR § 2.101.  A

nondevelopmental item has likewise been fully developed and successfully utilized, but by

government purchasers rather than commercial ones.  *Id.*

2.     The purpose of § 3453 is to ensure that government agencies not engage in

wasteful, inefficient, time-consuming, and unpredictable developmental projects that seek to

design and develop new products when existing products have already been developed that are

capable of meeting the agency's procurement needs with only minor modifications or

modifications of the type customarily available in the commercial marketplace.

3.     Using millions of dollars and industry-leading experts from the top artificial

intelligence companies in the world, Percipient has developed state-of-the-art computer vision

technology that has been successfully deployed by government agencies.  Percipient's product

more than satisfies all the needs of one of the two central components of an NGA procurement.

Yet NGA has failed to ensure that Percipient's product is incorporated into the procurement or even given an opportunity to compete to meet the requirements it demonstrably is able to meet; instead, NGA has decided to allow its prime contractor to begin launching a costly and wasteful developmental project that will enrich the contractor at the expense of taxpayers—all in an effort to develop a new software product to meet needs that an existing, state-of-the-art product already meets. This is precisely the kind of conduct that § 3453 was enacted to prevent.

*****

4.    NGA is the lead federal agency for providing geospatial intelligence, operating under the oversight of the Department of Defense ("DOD"), the Director of National Intelligence ("DNI"), and Congress. NGA, *About NGA*, https://www.nga.mil/about/About_Us.html (last visited Jan. 6, 2023).

5.    In January 2021, NGA awarded a contract to a defense contractor named CACI International, Inc. ("CACI"). That contract was a multi-year contract of "indefinite delivery" and "indefinite quantity" that would consist of multiple task orders, that contemplated the use of subcontractors where appropriate, and provided for the use of commercial or nondevelopmental items to the maximum extent practicable. The contract was designed to fulfill NGA's needs for a project described as Structured Observation Management ("SOM"), Automation, Augmentation and Artificial Intelligence Framework for Integrated Reporting and Exploitation—known by the acronym "SAFFIRE."

6.    Broadly speaking, SAFFIRE consists of two overarching components. The first is to provide an enterprise repository backbone for storing, managing, and disseminating data (known as the "SOM Enterprise Repository" or "SER"). The second is to provide a flexible, user-facing computer vision system for analyzing, storing, organizing, and producing useful

2

intelligence from the vast amounts of geospatial-intelligence data that NGA collects from satellites and other sources ("CV System").

7.    The plaintiff in this case, Percipient, has a fully developed and highly sophisticated computer vision product that is more than capable of meeting the needs of the CV System component of the overall SAFFIRE project.  The product is a state-of-the-art software platform named "Mirage" that has been purchased as an alternative to development and widely used by both commercial and governmental entities operating in the Intelligence Community and involved in protecting national security.  It is exceptionally well-suited to meet (and even exceed) NGA's needs for the CV System component of the overall SAFFIRE project.  Indeed, NGA's Associate Director of Capabilities acknowledged after a demonstration that Mirage "meets all of NGA's analytic transformation requirements."

8.    Despite the availability of Mirage and potentially other commercial or nondevelopmental items to meet SAFFIRE's CV System requirements, NGA has recently made clear that it is permitting its contractor CACI to develop new software in an uncertain and expensive effort to meet a substantial part, if not all, of SAFFIRE's CV System requirements, even though NGA itself has acknowledged that there is nondevelopmental software available that can meet those requirements.  Further, NGA has done this without itself conducting or requiring its contractor to conduct whatever market research or further evaluation it claims is necessary to confirm Mirage's ability to meet SAFFIRE's CV System requirements.  These actions violate 10 U.S.C. § 3453.

9.    Enacted as part of the Federal Acquisition Streamlining Act of 1994 ("FASA"), § 3453 establishes a mandatory preference for acquiring commercial items "to the maximum extent practicable" to meet government requirements in lieu of long-term development contracts.

Such developmental contracts were and remain prevalent in the defense industry, and Congress recognized that they frequently delay delivery, waste precious resources, and produce inferior, inadequate, or obsolete technology. To implement the preference for commercial and nondevelopmental items, § 3453 imposes various requirements on procurement officials at different stages of the procurement process, including after an award is made.

10.    Section 3453 requires government agencies to acquire commercial and nondevelopmental items to meet agency requirements "to the maximum extent practicable." Further, it prohibits agencies from staying ignorant of commercial capabilities (either willfully or through lack of effort) by affirmatively requiring them to conduct sufficient market research to determine the availability of commercial or nondevelopmental items that "(A) meet the agency's requirements, (B) could be modified to meet the agency's requirements, or (C) could meet the agency's requirements if those requirements were modified to a reasonable extent." *Id.* § 3453(c)(2). This market research must be conducted before developing specifications for a procurement, before soliciting bids, and "before awarding a task order or delivery order in excess of the simplified acquisition threshold." *Id.* § 3453(c)(1). The "simplified acquisition threshold" is $250,000. Section 3453 also provides that the market research must be used to make an actual determination regarding the availability of commercial and nondevelopmental items to meet the agency's needs. *Id.* § 3453(c)(2).

11.    Additionally, and of particular importance to this case, § 3453(b)(2) and (c)(5) require agencies to ensure that their contractors follow the same requirements. Specifically, § 3453(b)(2) provides that:

> The head of an agency shall ensure that procurement officials in that agency, to the maximum extent practicable . . . *require prime contractors and subcontractors at all levels under the agency contracts to incorporate commercial services,*

4

*commercial products, or nondevelopmental items other than commercial products as components of items supplied to the agency.*

(emphasis added).

12.     Likewise, § 3453(c)(5) provides that:

The head of an agency shall take appropriate steps to ensure that any prime contractor of a contract (or task order or delivery order) in an amount in excess of $5,000,000 for the procurement of products other than commercial products or services other than commercial services engages in such market research as may be necessary to carry out the requirements of subsection (b)(2) before making purchases for or on behalf of the Department of Defense.

13.     The purpose of the statute is to ensure that the government take advantage of products that have already been fully developed by the private sector and that can meet the government's needs with relatively minor modifications, rather than engaging in costly, time-consuming, and highly uncertain efforts to develop such products from scratch, which results in wasted resources, delays in implementation, and products that are inferior to those that are already fully developed and available from the private sector.

14.     This Court first enforced the requirements of 10 U.S.C. § 3453 by invalidating a U.S. Army solicitation for a developmental project in *Palantir v. United States*, 129 Fed. Cl. 218 (2016), a decision that was then affirmed by the Federal Circuit, 904 F.3d 980 (Fed. Cir. 2018). (At the time of the *Palantir* decisions, 10 U.S.C. § 3453 was enumerated as 10 U.S.C. § 2377 – the statute was renumbered in 2021, but its substantive provisions remain the same).

15.     Prior to this Court's decision in *Palantir*, no court had enforced the provisions of § 3453, and it appeared that government agencies were not taking seriously the statute's requirements to conduct market research into the availability of commercial and nondevelopmental items, to make the required determinations about the availability of such items, and to procure such items to meet their procurement needs "to the maximum extent

5

practicable." This case demonstrates that at least some government agencies are still failing to comply with the statute.

16.     The SAFFIRE procurement and its CV System component both involve procurements well in excess of $5 million, thus triggering the requirement that the prime contractor conduct market research necessary to make the required determinations as to the availability of commercial or nondevelopmental items. Yet CACI has failed to conduct such market research and make such determinations, and NGA has failed to require CACI to do so. The record makes clear that NGA knows that Mirage can meet its requirements, yet is failing to require its contractor CACI either to license Mirage or to conduct the market research necessary to make the statutorily required determinations as to the availability of commercial or nondevelopmental items that meet agency requirements. Instead, NGA is allowing CACI to engage in a wasteful, inefficient, self-serving, and uncertain software development project to attempt to meet the needs of the CV System.

17.     This is precisely the kind of problem that § 3453 was intended to prevent. Traditional government contractors like CACI have an obvious financial incentive to get paid to develop their own products rather than to acquire a product that has already been developed by another company. Further, government contracting officials often find it easier to defer to established government contractors, rather than doing the work of evaluating the capabilities of commercial items to meet their agency's needs. But for the requirements of § 3453, it would be easy for agency officials and prime contractors to overlook (either deliberately or inadvertently) new technologies that have been developed and proven by the private sector, both for commercial use and use by other government agencies, in favor of adopting the traditional approach of hiring a government contractor to try to develop a new solution from scratch.

6

"Business as usual" naturally results in inefficient and wasteful spending, and in the failure to incorporate state-of-the art technologies developed in the private sector.  And the harm caused by this kind of inertia is compounded in time periods where the private sector is making substantial advances in technological innovation, as has been the case over the past decade in the area of artificial intelligence and computer vision.  In such periods, an agency need that may otherwise seem to require development of a new solution may actually be met by a relatively recent innovation in the private sector – an innovation that can easily be overlooked absent rigorous research and analysis.  Failing to identify such innovation leads to further waste, delay, inefficiency, and poor outcomes.  These are the ills § 3453 was designed to correct.

18.    For the same reasons, § 3453 applies to ongoing procurements where commercial or nondevelopmental items can meet substantial portions of a procurement's overall requirements.  Had Congress not imposed those requirements, agencies and incumbent contractors in long-term contracts could ignore commercial technologies with impunity.  Not enforcing those requirements would also allow agencies to pay lip service to their obligations by including boilerplate provisions in contracts that require integration of commercial or nondevelopmental items, while allowing their contractors to flout them in implementation.  This case provides an apt example.

19.    Percipient's Mirage product meets SAFFIRE's CV System requirements, but Percipient did not purport to satisfy all of the other needs associated with the SOM Enterprise Repository which was part of the same SAFFIRE solicitation.  Further, the SAFFIRE solicitation and the accompanying task order itself purported to require CACI to adopt commercial technology to meet SAFFIRE's requirements.  Percipient thus did not bid for the SAFFIRE contract or challenge the SAFFIRE solicitation or award.  Instead, it expected NGA and CACI to

follow the requirements of § 3453 and the apparent reference to those provisions in the solicitation and the task order. Percipient brought this suit only when it became clear that NGA had failed to comply with its statutory obligations, and had no intention of remedying that failure.

20.    Immediately following the SAFFIRE award to CACI in January 2021, and for the past two years, Percipient has been explaining to both NGA and CACI that its Mirage product can meet the CV System needs associated with SAFFIRE. In response, NGA officials repeatedly assured Percipient that there would be an evaluation of whether commercial items exist that could meet the CV System needs before developing software to meet those requirements, that Mirage would be evaluated to determine whether it met those requirements, and that Mirage could therefore be offered as a complete solution to the CV System needs. Percipient relied on such assurances and representations that Mirage would be considered.

21.    Unfortunately, those assurances proved unreliable. CACI subsequently informed Percipient that it intended to develop the software to meet SAFFIRE's CV System requirements, despite failing to do an evaluation of Mirage or to make any determinations as to its ability to meet those requirements. When Percipient informed NGA of CACI's statements, NGA agreed to a demonstration of Mirage's capabilities, after which it acknowledged that Mirage appeared to meet SAFFIRE's CV System requirements. NGA initially agreed to conduct a fuller evaluation of Percipient's ability to do so, but this proved to be a bait and switch. After Percipient devoted more than $1 million of time and resources and months of effort to secure and implement the promised evaluation, NGA and CACI failed to conduct the promised evaluation and declined to evaluate Mirage to meet SAFFIRE's CV System requirements.

22.     NGA and CACI thus have now both made clear that they will not allow Percipient to offer Mirage to meet the needs of the CV System.  Further, to the extent they claim that further evaluation would be required to determine that Mirage or other commercial items can meet those requirements, they have confirmed they have no intention of conducting that evaluation.  Instead, CACI itself intends, with NGA's approval, to try to develop its own software platform to attempt to meet the needs of the desired CV System.  At most, NGA and CACI have indicated that CACI may at some undefined point seek to integrate certain commercial items for discrete sub-components of SAFFIRE on a vague and undisclosed basis and opaque timeline.

23.     Percipient therefore seeks relief in this Court to enjoin NGA's violations of § 3453.  Among other things, this Court should enjoin NGA from allowing CACI to continue with its effort to develop a CV System solution without first conducting market research sufficient to make the statutorily required determinations as to the availability of commercial or nondevelopmental items to meet the needs of the CV System.  Further, it should require NGA to take appropriate steps to ensure that CACI performs the necessary market research (with NGA oversight, input, and approval), uses the market research to make the required determinations about the availability of commercial or nondevelopmental items that satisfy the needs of the desired CV System, and procures such commercial or nondevelopmental items to the maximum extent practicable.

## **PARTIES**

24.     Plaintiff Percipient is a corporation incorporated under the laws of the State of Delaware.  It has a principal place of business in Santa Clara, California, and it also has an office in Reston, Virginia.  Percipient has a team of industry-leading scientists and leaders with experience in artificial intelligence, computer vision, and national security.

25.    The Defendant is the United States, acting through the Department of Defense and NGA.

<u>**JURISDICTION**</u>

26.    This Court has jurisdiction over this challenge to NGA's ongoing SAFFIRE procurement pursuant to 28 U.S.C. § 1491(b)(1).  Among other things, that statute states that this Court "shall have jurisdiction to render judgment on an action by an interested party objecting to . . . any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  *Id.*

27.    Plaintiff Percipient is an interested party because it offers state-of-the-art software as a commercial or nondevelopmental item that meets and even exceeds the requirements of SAFFIRE's CV System requirements and that is substantially likely to be acquired by NGA or its contractor if NGA were required to comply with its obligations under § 3453 and the other provisions of law invoked in this Complaint.  Those provisions govern NGA's ongoing post-award obligations to ensure that its contractors acquire commercial or nondevelopmental items "to the maximum extent practicable" and that they conduct necessary market research to determine the ability of such items to meet the requirements of government contracts before trying to develop new products to meet those requirements.  Plaintiff notified NGA and its contractor about its product and its ability to meet the contract's CV System requirements, and Defendant initially claimed that NGA and its contractor would evaluate the ability of nondevelopmental items to meet SAFFIRE's requirements prior to trying to develop new software to meet those requirements.  Relying on these assurances, Plaintiff engaged in good faith discussions with NGA to secure whatever evaluation of its product that NGA claimed to be necessary to determine the ability of nondevelopmental or commercial items generally, and Mirage specifically, to meet SAFFIRE's requirements.  Plaintiff brought suit only when

Defendant confirmed through its actions and statements that it would not be requiring its

contractor to procure commercial or nondevelopmental items to meet SAFFIRE's CV System

requirements and that it would not be conducting any additional market research or evaluation

that it claims to be necessary to make the statutorily required determinations.

## FACTUAL ALLEGATIONS

I.    **The Law Requires Government Agencies And Their Contractors To Meet Procurement Needs By Acquiring Nondevelopmental Items "To The Maximum Extent Practicable," Rather Than By Engaging In Wasteful And Inefficient Development Projects.**

    A.    **10 U.S.C. § 3453 requires agencies and their contractors to procure nondevelopmental items "to the maximum extent practicable" and to conduct market research necessary to determine the practicability of acquiring such items to meet agency requirements.**

28.    In 1994, Congress enacted the Federal Acquisition Streamlining Act ("FASA").

Federal Acquisition Streamlining Act of 1994, Pub. L. No. 103-355, § 8104, 108 Stat. 3243

(1994) (current version at 10 U.S.C. § 3453). FASA requires agencies "to the maximum extent

practicable" to procure commercial and non-developmental items to meet agency requirements.

Further, it requires agencies to ensure that their contractors do the same.

29.    To implement this clear and mandatory preference, Congress imposed a series of

requirements that apply both to civilian, non-defense contracts, 41 U.S.C. § 3307, and to

contracts entered into by agencies within the Department of Defense relating to national security,

defense, or intelligence, 10 U.S.C. § 3453.

30.    Section 3453(a) ensures that agencies that agencies do not add artificial or

unnecessary requirements that exclude commercial items from competing. It states:

*The head of an agency shall ensure that, to the maximum extent practicable—*

    (1) requirements of the agency with respect to a procurement of supplies or services are stated in terms of—

(A) functions to be performed;

(B) performance required; or

(C) essential physical characteristics;

(2) such requirements are defined so that commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items, may be procured to fulfill such requirements; and

(3) offerors of commercial items and nondevelopmental items other than commercial items are provided an opportunity to compete in any procurement to fill such requirements.

*Id.* (emphasis added).

31.    Section 3453(b) requires the "head of an agency" to ensure that procurement officials in that agency, "*to the maximum extent practicable*":

(1) acquire commercial items or nondevelopmental items other than commercial items to meet the needs of the agency;

(2) *require prime contractors and subcontractors at all levels under the agency contracts to incorporate commercial services, commercial products, or nondevelopmental items other than commercial products as components of items supplied to the agency*.

*Id.* § 3453(b)(1)-(2) (emphasis added).

32.    Section 3453 also contains requirements designed to prevent agencies and their contractors from remaining ignorant of available commercial or nondevelopmental items. Agencies must "conduct market research appropriate to the circumstances" before developing new specifications, soliciting bids or proposals, and awarding a task order or delivery order, and "shall use the results of market research" to determine whether commercial or nondevelopmental items are available that:

(A) meet the agency's requirements;

(B) could be modified to meet the agency's requirements; or

12

(C) could meet the agency's requirements if those requirements were modified to a reasonable extent.

*Id.* § 3453(c)(2).

33.    Further, § 3453(c)(5) requires agencies to:

take appropriate steps to ensure that *any prime contractor of a contract (or task order or delivery order) in an amount in excess of $5,000,000 for the procurement of products other than commercial products or services engages in such market research as may be necessary to carry out the requirements of subsection (b)(2)* before making purchases for or on behalf of the Department of Defense.

(emphasis added).

34.    Regulations implementing § 3453 similarly provide that "agencies shall [t]o the maximum extent practicable, ensure that acquisition officials . . . [r]equire prime contractors and subcontractors at all tiers under the agency contracts to incorporate commercial products, commercial services, or nondevelopmental items as components of items supplied to the agency."  48 CFR § 11.002 (a)(2)(iv).

35.    Congress enacted FASA to address the waste and inefficiencies stemming from a history of long-term developmental contracts that did not sufficiently take advantage of existing commercial technology.  Such contracts led to cost overruns, wasted resources, unnecessary delay, and use of inferior and outdated technology, particularly in the defense industry.  As a result, in its report for the legislation, the Senate Armed Services Committee stressed that it was "critical" that the Defense of Department "rely to the maximum extent possible on the commercial sector rather than promote government-dependent sectors," and that its "outmoded system" needed to be transformed to enable "the government to buy goods and services cheaper and faster" and "meet the defense industrial and technology base requirements of the future."  S. Rep. 103-259, 1994 WL 184554, *6 (May 12, 1994).

36.     Then-Defense Secretary William Perry similarly testified in connection with

Congress' FASA deliberations that:

> Commercial technology advancements are outpacing DoD sponsored
> efforts in the same sectors that are key underlying technologies for military
> superiority (e.g., computers, software, integrated circuits, communications,
> and advanced materials).  The current development and production of DoD
> systems takes too long. The design cycle for commercial technologies is
> approximately 3-4 years, in DoD it is 8-10 years.  Many DoD systems are
> technologically obsolete at the time they are fielded.

Secretary William Perry's Testimony to Congress, S. Rep. 103-259, 1994 WL184554, *5.

37.     The Senate Committee on Government Affairs similarly stated that the "purchase

of proven products such as commercial and nondevelopmental items can eliminate the need for

research and development, minimize acquisition lead time, and reduce the need for detailed

design specifications or expensive product testing."  S. Rep. 103-258, 1994 WL 188485, *6

(May 11, 1994).  It also noted that the current system "frequently sets standards for its purchases

that make them more costly, but not substantially more useful, than other products available

through normal commercial channels."  *Id.* at *9.

38.     The House Committee on Government Operations amplified the same concerns,

stating:

> The Federal procurement system is still plagued with the all-too-common practice
> of buying expensive, specially-designed products, when off-the-shelf, commercial
> products would do the job just as well.  In this era of fiscal restraint, the Federal
> Government must stop 're-inventing the wheel' and learn to depend on the wide
> array of products and services sold to the general public on a routine basis.  Over
> the years, numerous commissions and studies have recommended that the
> Government revise its policies to improve its ability to buy commercial products.

H. Rep. 103-545(I), 1994 WL 261997 (June 13, 1994).

14

**B.  More recent statutes, regulations, and reports have emphasized the importance of acquiring nondevelopmental items in the areas of software and artificial intelligence technology.**

39.     Congress has reinforced § 3453's requirements in the specific areas of computer software and artificial intelligence, and various government reports have warned that failure to adopt the most advanced commercial software in these areas will greatly compromise the country's intelligence capabilities.

40.     Congress has reiterated the importance of acquiring commercial or nondevelopmental items in enacting the annual National Defense Authorization Act ("NDAA"). For example, § 803 of the NDAA for Fiscal Year ("FY") 2009 provides:

> (a) In General.--The Secretary of Defense shall ensure that contracting officials identify and evaluate, at all stages of the acquisition process (including concept refinement, concept decision, and technology development), opportunities for the use of commercial computer software and other non-developmental software.

NDAA FY09, P.L. 110-417, § 803(a), 122 Stat. 4519.

41.     Likewise, regulations have implemented the preference for acquiring commercial and nondevelopmental items, especially in the area of computer software.  The Defense Federal Acquisition Regulation Supplement ("DFARS") now requires departments and agencies—"at all stages of the acquisition process (including concept refinement, concept decision, and technology development)"—to identify and evaluate "opportunities for the use of commercial computer software and other non-developmental software in accordance with Section 803 of the National Defense Authorization Act for Fiscal Year 2009 (Pub. L. 110-417)." 48 CFR § 212.212.

42.     The same is true in the area of artificial intelligence.  In 2018, Congress established the National Security Commission on Artificial Intelligence (NSCAI) to conduct a "comprehensive and national-level review" of AI and make "[n]ear-term actionable

15

recommendations to the Secretary for the Department of Defense to secure and maintain technical advantage in artificial intelligence, including ways . . . to most effectively leverage investments in basic and advanced research and commercial progress in these technologies." NDAA FY19, P.L. 115-232, § 238(e)(3)(A), (B)(iii), 132 Stat. 1697.

43.     NSCAI's March 2021 Final Report warns of the consequences of the Government ignoring private innovations.  It found that the "government lags behind the commercial state of the art in most AI categories," and that "[b]ureaucracy is thwarting better partnerships with the AI leaders in the private sector that could help."  NSAIC, *Final Report* 24 (Mar. 2021).[1]  In order to "win the technology" competition, the government must rely on private party innovations:

> Most AI progress in the United States should remain with the private sector and universities.  We must not lose an innovation culture that is bottom-up and infused with a garage-startup mentality . . .  We will need a hybrid approach meshing government and private-sector efforts to win the technology competition.

*Id.* at 25.

44.     NSCAI found that the Department of Defense "lags far behind the commercial sector in integrating new and disruptive technologies such as Artificial Intelligence (AI) into its operations.  Technical, bureaucratic, and cultural challenges must be overcome to adopt AI to maintain the U.S. military advantage."  *Id.* at 291.  As a result, NSCAI recommended, among other things:

- Shared responsibility among the public and private sector to address the challenges resulting from the "speed of technology development of the private sector" that "has vastly outpaced federal policies and regulations."  *Id.* at 449.

- Simplification of the "contracting process to attract non-traditional vendors" by the Department of Defense and Intelligence Community.  *Id.* at 451.

---

[1] Available at https://www.nscai.gov/wp-content/uploads/2021/03/Full-Report-Digital-1.pdf.

- Direct adoption of private sector AI applications, thereby driving "additional commercial investment in AI applications that benefit national security and the public good." *Id.* at 193.

NSCAI provided these recommendations to facilitate the Government's "broader adoption of best-in-class commercial AI software." *Id.* at 451.

45.     Every year since it established NSCAI, Congress has passed legislation addressing the importance of acquiring commercial AI technology to national security needs in the NDAA.  In 2019, for example, Congress required the Director of National Intelligence to analyze how major AI initiatives in the intelligence community "leverage advances in artificial intelligence and machine learning in the private sector."  NDAA FY20, P.L. 116-92, § 5711(a)(1)(A), (2)(D), 133 Stat. 2170-71.

46.     The next year, Congress placed AI technology front and center, including 20 consequential provisions on the topic in NDAA FY21.  *See, e.g.*, NDAA FY21, P.L. 116-283, §§ 231-36, 134 Stat. 3479-86.

47.      For example, Congress modified the section entitled, "Joint Artificial Intelligence Research, Development, and Transition Activities" to insert the word "acquire," before "develop" so that it now reads: "The Secretary of Defense shall establish a set of activities within the Department of Defense to coordinate the efforts of the Department to acquire, develop, mature, and transition artificial intelligence technologies into operational use."  *Id*. § 232(1)(A). Further, Congress modified subsection (a), paragraph (2), titled "Emphasis," as follows:

The set of activities established under paragraph (1) shall include—

(A)     *acquisition* and development of mature artificial intelligence technologies in support of defense missions;

(B)     applying artificial intelligence and machine learning solutions to operational problems *by directly delivering artificial intelligence capabilities* to the Armed Forces and other organizations and elements of the Department of Defense;

17

(C)    *accelerating* the development, testing, and fielding of new artificial intelligence and artificial intelligence enabling capabilities . . ..

*Id.* § 232(1)(B) (emphasis added).

48.    In 2021, Congress specifically required simplified acquisition processes for commercial AI companies.  NDAA FY22, P.L. 117-81, § 227, 135 Stat. 1609.  Section 227(a)-(b) of NDAA FY22 required the Secretary of Defense to ease certain requirements "to ensure that Department of Defense components can more easily contract with leading commercial artificial intelligence companies to support the rapid and efficient development and deployment of applications and capabilities."  *Id.* § 227(a)-(b).

49.    The same NDAA provided that the Secretary of Defense "shall ensure that, to the maximum extent practicable, commercial artificial intelligence companies are able to offer platforms, services, applications, and tools to Department of Defense components through processes and procedures under part 12 of the Federal Acquisition Regulation."  *Id.* § 227(c).

50.    Most recently, on December 23, 2022, the President signed the NDAA FY23 into law, also addressing commercial AI companies and federal contracting.  Section 861 requires the Secretary of Defense to "submit to the congressional defense committees a comprehensive strategy to increase competitive opportunities available for appropriate United States companies to transition critical technologies into major weapon systems and other programs of record," a strategy which must include an "evaluation of how to integrate existing commercial capabilities relating to such end items of appropriate United States companies or entities in the defense industrial base into major weapon systems and programs of record in the Department of Defense."  NDAA FY23, H.R. 7776-341, § 861(a)(1), (b)(1)(B).  "Artificial intelligence and machine learning" are expressly defined as "critical technology."  *Id.* § 861(c)(3)(D).

51.     Other government reports have similarly emphasized the importance of acquiring AI from the private sector in order to have a successful national intelligence strategy.  For example, the Office of the Director of National Intelligence emphasized in its AIM (Augmenting Intelligence Through Machines) Strategy that it "will achieve superiority by adopting the best available commercial AI applications and combining them with IC-unique algorithms and data holdings to augment the reasoning capability of our analysts."  Director of National Intelligence, *The Aim Initiative: A Strategy For Augmenting Intelligence Using Machines* iv (Jan. 2019).[2]

52.     In addition, the Center for Strategic and International Studies (CSIS)'s Technology and Intelligence Task Force found that the Intelligence Community's "[f]ailure to adapt" to the new artificial intelligence era will "result in loss to adversaries and irrelevance to U.S. policy."  CSIS, *Maintaining the Intelligence Edge: Reimagining and Reinventing Intelligence through Innovation* ix (Jan. 2021).[3]  The CSIS Task Force explained:

> China and Russia, in particular, are moving rapidly to integrate emerging technologies into military and intelligence operations.  In the race for technological intelligence superiority, the upper hand will go to those who innovate and adapt fastest . . . The IC must also adopt and assimilate these technologies to compete with alternative sources of intelligence for policymakers.  The improving quality of open-source intelligence (OSINT), commercialization of space, and greater facility and ease in integrating AI and data analytics will enable private sector organizations to produce multisource intelligence that could rival or even beat the IC in terms of accuracy and relevance for policymakers—faster and cheaper.

*Id.* at ix-x.

53.     As a result, the CSIS Task Force specifically recommended that Intelligence Community analytic agencies "move rapidly to *procure, adapt, and integrate commercial off-the-shelf AI applications* using machine learning and natural language processing for traffic

---

[2] Available at https://www.dni.gov/files/ODNI/documents/AIM-Strategy.pdf.

[3] Available at https://csis-website-prod.s3.amazonaws.com/s3fs-public/publication/210113_Intelligence_Edge.pdf.

optimization, summarization, and categorization." *Id*. at 48 (emphasis in original).  The CSIS

Task Force concluded that the Intelligence Community faces a "serious and rapidly accelerating

set of threats" and that the "integration of emerging technologies will play perhaps the deciding

role in the IC's ability to execute these missions." *Id*. at 43.

## II.    NGA's SAFFIRE Procurement Seeks Both An Enterprise Repository And An Advanced Computer Vision System ("CV System").

54.    NGA describes its vision as "Know the Earth . . . Show the Way . . . Understand

the World."  Its mission is to provide geospatial intelligence (GEOINT) for the country's

security through exploitation and analysis of imagery and geospatial information to describe,

assess, and visually depict physical features and geographically-referenced activities on earth.  It

obtains such data from a variety of sources, including satellites, drones, and other aircraft.

55.    Because there is too much data for humans to effectively review and evaluate, and

because of the often time-sensitive importance of the data, NGA needs advanced Computer

Vision ("CV") technology to help it understand, contextualize, classify, and produce insights and

actionable intelligence from the GEOINT data as expeditiously as possible.  CV is a type of

artificial intelligence technology that trains and uses computers to interpret the visual world.

56.    As explained by NGA's Chief Technology Officer in *NGA Technology Strategy*,

NGA's GEOINT data are "not leveraged to full potential."  NGA CTO, *NGA Technology

Strategy* 13 (May 2020).[4]  To "Unlock the Value of Data," NGA's CTO called for support in the

critical area of AI and specifically listed "AI to augment the human analytical workforce" as a

key technology to prioritize in the near-term.  *Id.* at 13, 40.  As further explained in *NGA Tech

Focus Areas 2020*, "Geospatial AI will be needed to support and expand our intelligence

---

[4] Available at https://www.nga.mil/assets/files/200505P001_NGA_Technology
_Strategy_APR_20-512.pdf.

professionals' depth and coverage.  While conventional approaches have had success, NGA is seeking novel, innovative approaches to increase capability in computer vision on existing geospatial datasets."  NGA CTO, *NGA Tech Focus Areas 2020* 12 (Apr. 2020).[5]

57.    To address these needs, NGA issued the SAFFIRE solicitation in January 2020. SAFFIRE stands for "SOM AAA Framework for Integrated Reporting and Exploitation." "SOM" stands for "Structured Observation Management" which refers to NGA's process for observing, classifying, organizing, and sharing GEOINT data.  "AAA" refers to "artificial intelligence, automation, and augmentation."  According to NGA, SAFFIRE will address its "mission-critical need for sustaining and improving manual Structured Observational Management (SOM) production and storage and integrating these capabilities with Computer Vision (CV) processing."  Such a system will allow its analysts to more accurately and efficiently review, classify, and generate and share actionable intelligence from visual data (called SOM data).

58.    For example, in order to identify and discern the significance of changes in movement of particular types of military equipment in a particular part of the world, an analyst might need to manually review and classify and produce useful intelligence from thousands of images over the relevant period of time.  Further, for any single geospatial image file, the resultant SOM data might include several analyst observations:  *e.g.*, identifying the number of vehicles in the image; noting other objects that are present; and noting any changes in the area since the last image was taken.  The CV System greatly improves the analyst's ability to produce SOM data by, among other things, (i) automatically and expeditiously sorting through millions of image files; (ii) applying, integrating, and improving models that allow for automatic

---

[5] Available at  https://www.nga.mil/assets/files/2020Tech_Focus_Areas_PR_20-509.pdf.

detection of the objects; (iii) alerting the user as to when particular changes occur and allowing the user to establish rules for when the alerts will take place; (iv) selecting the images that most likely include a match of the vehicle at issue; and (v) tagging and sharing images and observations with other users.

59.    SAFFIRE's requirements include:

a.    the "SOM Enterprise Repository," or "SER," which will be the enterprise backbone for storing, disseminating, and regulating access to the SOM data.

b.    a user-facing CV System.

60.    This Complaint refers to the first component as SAFFIRE's "SOM Enterprise Repository" or "SER."  The requirements for SAFFIRE's SOM Enterprise Repository are described in sections 1.1.2 and 1.3 of SAFFIRE's Statement of Requirements.  The repository will, among other things, store and disseminate CV data and services used by NGA and others (such as its international partners), and it will enable users with different access levels across various large organizations to use the data to achieve their intelligence objectives.

61.    SAFFIRE's CV System requirements are described in sections 1.1.1, 1.1.3, 1.1.4, 1.2, and 1.4-2 of the Statement of Requirements.  The CV System includes at least three primary capabilities with a set of requirements for each:

a.    SOM Data Production (SDP) – The SDP will provide the "primary user experience for producing imagery-derived structured data."  It enables analysts to use CV capabilities in their workflow by, for example, choosing relevant CV models to use; specifying parameters for the models; viewing, analyzing, and classifying the GEOINT data provided by the CV software (*e.g.*, potentially relevant image data); and creating the resultant SOM data for storage in the Enterprise Repository.  Sections 1.1.1 and 1.2 of the

Statement of Requirements refer to this component as the "SOM Data Production (SDP)."

b.      CV Integration (CVI) – CVI refers to the ability to integrate, evaluate, and train different CV models and CV software.  For example, if NGA develops a new CV "model" for identifying a certain type of tank, the system must be able to integrate and evaluate that model.  Sections 1.1.3 and 1.5 of the Statement of Requirements refer to these (and other related) capabilities as "CV Integration (CVI)."

c.      Computer Vision Processing (CVP) – An automated CV component that applies CV models, analyzes the raw data (e.g., image files), and provides potentially relevant GEOINT data to the users for their analysis.  Using feedback from analysts, this component can be used to refine and "train" the CV models it is applying.  Sections 1.1.4 and 1.6 of the Statement of Requirements refer to these (and other related) capabilities as "Computer Vision Processing (CVP)."

**III.    Percipient's CV Platform (Mirage) Meets And Exceeds SAFFIRE's Requirements For A CV System.**

62.      Percipient's Mirage Intelligence Analysis Platform ("Mirage") is now a fully developed and state-of-the-art CV System that meets and exceeds SAFFIRE's CV System requirements.  Further, its open architecture allows it to be readily integrated with the contemplated SOM Enterprise Repository.

63.      Founded in 2017, Percipient's founders and team developed Mirage and its geospatial module with private venture financing over a three-year period.  Its founders and team took the unusual path of building a product with NGA's specific missions in mind, but without the commitment of resources from the U.S. government or NGA, with the idealistic aim of building an AI product that would play a critical role in advancing the country's national

intelligence needs.  Percipient had the confidence that a product flexible and robust enough to meet the needs of the most sophisticated consumer of geospatial data in the world could readily meet any commercial need for any use of computer vision to process, analyze, and utilize geospatial and other CV data.  Many of its team gave up high-ranking positions at top private sector companies for the opportunity to work to develop a product that would serve the national interest.

64.    Percipient achieved this goal largely due to the vision, skills, and experience of its co-founders and extraordinarily accomplished team of scientists and engineers who are leaders in the computer vision field.  It was cofounded by Raj Shah, who led the development of Google Maps as the head of Google Maps Data, and Balan Ayyar (Brig Gen., USAF Ret.), who conceived of Mirage and brought mission expertise and combat experience in the ways technology must improve intelligence capabilities while serving in a variety of senior leadership positions.  These positions included the Military Assistant to the Secretary of Defense and Commanding General, Combined Joint Interagency Task Force 435, in Kabul, Afghanistan in which NGA was a participating organization.  Percipient's team has dozens of individual patents in computer vision, over 100 publications in leading computer vision conferences and journals, PhDs in math or computer vision, and more than 15 years of direct software engineering experience in artificial intelligence at leading technology firms such as Google, Microsoft, Nokia, and Uber using geospatial data in computer vision applications.  Equally importantly, given the purposes of § 3453, by virtue of their experience in the private sector, Percipient's team members have records of building products that people want to use and that are used by more than one billion people around the world.

65.    Mirage combines a robust software CV engine with a seamless user interface so that analysts can more accurately and quickly analyze and categorize intelligence data.  Its geospatial module, for example, uses state-of-the-art computer vision technology to provide a best-in-class detection, recognition, classification, and structured object management system. That system processes, analyzes, and produces visual data at massive petabyte scale at a sufficient level to support thousands of users and years of processed geospatial and other data. Its processing speed already exceeds the CV Processing performance requirements set forth in section 2.4 of SAFFIRE's Statement of Requirements.

66.    Percipient already has created a number of models and detection capabilities relevant to NGA and others:  equipment in overhead imagery, vehicle recognition (tanks, cars, trucks), facial recognition, and many others.  Mirage enables users to search hundreds of thousands of images like the following to analyze, process, detect, and classify objects within the images.



**Vehicle Detection**

67.    Mirage then applies its own models as well as those applied by third parties to locate specific objects, such as tanks, across hundreds of thousands of square kilometers of imagery spread across years—Mirage analyzes the data in seconds, returns results, and displays

search hits in an intuitive and easy-to-use manner.  The following screenshot, for example, identifies the number of various types of vehicles in the image and automatically provides close-ups of the identified objects for the analyst's review.



68.    In addition, Mirage contains tools for analysts to more accurately and quickly review, contextualize, analyze, and classify the CV data over time.  For example, Mirage created (i) customizable alerting features that analyze data automatically and notify users when objects, patterns, or changes are detected, and (ii) "geofencing" that allow users to focus on and analyze images within particular areas on a map, search for automatically and manually created detection data within that area, and analyze them over time and for any area in the world.  The following image is an example of geofencing an area on a map for analysis and identification of particular objects within that area.



69.     In addition to creating and deploying models and using them to analyze data,

Percipient's scientists created ingenious "incremental learning" features that enable users to train

the models (both its own and those designed by third parties) and employ the lessons learned to

improve future performance.  A large and diverse training dataset is one of the biggest factors in

determining the success of CV algorithms.  But obtaining that training data can be a laborious

exercise.  The "incremental learning" features automatically use user interactions with Mirage to

create and build upon a training dataset.  Such features vastly increase cooperation and mutual

learning between user and machine and enable the software to improve its own sophistication

and accuracy over time by enabling the software to learn from and be trained by the user.  NGA

(or other users of the platform) also can configure who will have qualifications to feed training

data into the system and in what areas and to inform the model when it has accurately or

inaccurately identified a particular object.  Mirage thereby learns from its users and adjusts its

detection and identification of objects in response to what it has learned.

70.     Mirage also enables users to design their own models and create customized

objects for detection to enhance the top-of-the-line object detectors that Mirage already has.

Percipient has pioneered patent pending techniques to create new models using so-called "low

shot learning" techniques that require very little training data. The automated learning technology then ensures that such models get better over time with analyst usage.

71. Mirage combines its incredibly complex processing and vast array of features with a highly intuitive user interface designed to permit analysts to more quickly and accurately review and contextualize data. One way that Mirage accomplishes this is through a proprietary engine that arranges potential matches by confidence level, thus enabling analysts to more quickly confirm the positive matches and discard or re-classify the other potential matches.

72. Mirage also can be tailored to the desired mission or objectives. Its open architecture can be readily integrated with new systems (including NGA's top secret environment), algorithms, and models—whether developed by Percipient or by third parties. NGA will therefore always be able to supplement the system on an ongoing basis with new models and capabilities from both Percipient and others.

73. Mirage exceeds many of the requirements that NGA and its contractor are now trying to meet through development efforts over a period of years. The Mirage features include:

      a.     its higher speed processing;

      b.     automatic learning in both Mirage's detectors and classifiers;

      c.     allowing for the creation of new object models through organic labeling, classification, and reclassification processes;

      d.     Mirage's command dashboard which allows analysts to create and monitor geofenced areas with threshold alerting for tipping and cueing with change detection and visual confirmation of changes over time; and

      e.     classifying detected objects by confidence level, allowing users to more quickly confirm positive matches and discard or re-classify other potential matches.

74.     With its initial correspondence, Percipient provided a highly detailed explanation of Mirage's capabilities and ability to meet the CV System requirements set forth in SAFFIRE's Statement of Requirements.  Indeed, Percipient's submission showed Mirage's capabilities to meet those requirements on a requirement-by-requirement basis.  Further, even if Mirage somehow did not meet some aspect of a requirement on an "off the shelf" basis because of a lack of current access to particular data or systems, its design enables it to meet such requirements with only minor modifications or modifications of the type customarily available in the marketplace.

75.     Based on Mirage's extraordinary capabilities and array of features, commercial and government customers in the intelligence and national security community have licensed and made wide use of the Mirage platform in lieu of developing new software to meet their requirements as NGA is now seeking to do.

76.     Further reflecting the capabilities of this software and the obvious advantages it provides to the U.S. intelligence community, just one month after Percipient provided a demo of its capabilities to the National Security Council in December 2019, the Department of Commerce issued an interim final rule amending the Export Administration Regulations to impose export license controls on such software to all destinations except Canada.  *See* Addition of Software Specially Designed To Automate the Analysis of Geospatial Imagery to the Export Control Classification Number 0Y521 Series, 85 Fed. Reg. 459 (Jan. 6, 2020).  The standard for imposing such requirements is "a determination by the Department of Commerce, with the concurrence of the Departments of Defense and State, and other agencies as appropriate, that the items warrant control for export because the items may provide a significant military or intelligence advantage to the United States or because foreign policy reasons justify control."  *Id*.

at 460.  The rule was issued as an interim final rule prior to comment based on the determination

that it was "in the national security interests of the United States to immediately implement these

controls."  *Id*.

77.    The description of the software in the regulation directly tracked capabilities of

Mirage.  Specifically, it amended the regulations to include:

> Geospatial imagery "software" "specially designed" for training a Deep Convolutional
> Neural Network to automate the analysis of geospatial imagery and point clouds, and
> having all of the following:
>
> 1.    Provides a graphical user interface that enables the user to identify objects
>       (*e.g.*, vehicles, houses, etc.) from within geospatial imagery and point
>       clouds in order to extract positive and negative samples of an object of
>       interest;
>
> 2.    Reduces pixel variation by performing scale, color, and rotational
>       normalization on the positive samples;
>
> 3.    Trains a Deep Convolutional Neural Network to detect the object of interest
>       from the positive and negative samples; and
>
> 4.    Identifies objects in geospatial imagery using the trained Deep
>       Convolutional Neural Network by matching the rotational pattern from the
>       positive samples with the rotational pattern of objects in the geospatial
>       imagery.

*Id*.

## IV.    In Violation Of 10 U.S.C. § 3453 And Related Laws, NGA Has Failed To Ensure That Percipient's Mirage Is Allowed To Compete To Satisfy The CV System Requirements Of SAFFIRE.

78.    As shown above, Mirage presents NGA with the ability to quickly, efficiently,

and cost-effectively acquire a state-of-the-art AI and CV platform that will instantly upgrade its

mission-critical systems, satisfy its CV System requirements, and enable it to take advantage of

future computer vision models and algorithms regardless of who develops them.  However,

instead of incorporating Mirage—or conducting any additional evaluation it claims to be

necessary to confirm Mirage's ability to meet SAFFIRE's CV System requirements—NGA is

allowing its contractor (CACI) to embark on a years-long process of trying to develop and build what already exists. In this way, NGA is allowing its contractor's economic incentives, rather than the practicability of deploying commercial items in lieu of developing new software, to guide the course of a procurement that is critical to national security. This decision violates the law, NGA's repeated assurances to the public and Percipient of their commitment to acquiring commercial technology, and the recognition of countless experts that deployment of commercial technology is critical to maintaining the United States' competitive edge in artificial intelligence.

79.     Percipient has gone to great lengths to secure NGA and CACI's evaluation of Mirage, and to offer Mirage as a nondevelopmental or commercial item that meets SAFFIRE's CV System requirements. Percipient has trusted and relied upon NGA's good faith and its representations that it would comply with the provisions of § 3453. Percipient turned to litigation only when (i) executives at NGA's prime contractor CACI admitted that they intended to develop the SAFFIRE CV System, and (ii) despite initial indications to the contrary by some officials, NGA ultimately made clear through its actions and statements that it would do nothing to stop CACI from proceeding according to its developmental plan, in violation of § 3453.

**A.     Percipient relied on NGA's public statements professing its commitment to acquiring technology developed by the private sector to meet its requirements, which the SAFFIRE solicitation said the awardee would be required to do.**

80.     NGA's professed commitment to acquiring commercial technology to meet its needs dates back to before the announcement of the SAFFIRE procurement. In 2016, NGA established an outpost to take advantage of private sector commercial innovation. Further, in April 2020, NGA's Chief Technology Office ("CTO") conveyed in an agency publication that private industry innovations would help NGA find new and unique solutions in key technology areas, such as AI. CTO, *NGA Tech Focus Areas 2020* 4 (Apr. 2020). The CTO encouraged

potential industry partners to contact NGA's Industry Engagement team if "interested in providing a demo of your capability." *Id.* at 15.

81.    Similarly, in May 2020, former Director Robert D. Sharp issued a statement titled, "Director's Intent," calling for NGA to "lead" the ongoing geospatial intelligence ("GEOINT") revolution. NGA, *Director's Intent* 2 (May 14, 2020). Critically, he recognized that NGA would not accomplish this by going "back to all of our old processes and procedures; we will adopt new ways of doing business." *Id.* NGA's personnel understood "new ways of doing business" to include acquiring emerging, but developed, technologies from the private sector. In a September 2020 interview with Space News, NGA's head of commercial operations stated, "NGA is pivoting from its traditional reliance on government-owned data and is moving to take advantage of private sector capabilities." Sandra Erwin, Space News, *NGA Building 'Huge Appetite' For Commercial Geoint* (Sept. 21, 2020), https://spacenews.com/nga-building-huge-appetite-for-commercial-geoint/.

82.    Consistent with the Director's call to action, NGA had opened an office in Silicon Valley to identify commercial technology to meet NGA needs. That office was called "Outpost Valley." A senior analyst at NGA's Outpost Valley stated her belief that the SAFFIRE procurement was "plug and play designed" and informed Percipient that "Mirage might be asked to be integrated into the larger SAFFIRE construct."

83.    NGA in fact drafted portions of the SAFFIRE solicitation to suggest that the system would be "plug and play" and thereby allow fulfillment of SAFFIRE's CV System requirements by the prime contractor incorporating commercial or nondevelopmental technology such as Mirage. For example, section L.25.2 of the solicitation requires the "Offeror" to "describe . . . a process to identify, evaluate and implement opportunities from the Government

*and commercial industry* as part of each planning increment to satisfy requirements faster, reduce or avoid cost and increase system performance" (emphasis added).  Similarly, in SAFFIRE's Task Order 0001 (dated January 6, 2020), the prime contractor must augment "user capability with automated detections of observations *by leveraging the rapidly maturing commercial computer vision technology*."  Task Order 0001 at § 1.1 (emphasis added).  The SAFFIRE solicitation also generally required the contractor "to the maximum extent practicable" to "incorporate, and require its subcontractors at all tiers to incorporate, commercial products, commercial services, or non-developmental items as components of items to be supplied under this contract."

**B.    Between the SAFFIRE solicitation and the award, CACI and NGA headquarters thwarted the deployment of Mirage in NGA's top secret environment.**

84.    Percipient also knew that officials at NGA's Outpost Valley office, which was specifically tasked with exploring and taking advantage of private sector innovation, were highly enthusiastic about Mirage's capabilities.  This enthusiasm and two earlier phases had led to an agreement to license Percipient's geospatial module and a ground order of battle prototype used to detect various vehicles to the "high side"—meaning NGA's top-secret environment.  Deploying Mirage in this context would have demonstrated its capabilities to meet the needs for a CV System, and would have further undermined any effort by other NGA officials to justify a development project to create a new CV System from scratch.

85.    This initial effort was thwarted by NGA officials outside of the Outpost Valley office and the eventual SAFFIRE awardee (CACI).  In a fox-guarding-the-henhouse scenario, CACI was put in charge of deploying Mirage (its competitor) on the high side based on CACI's responsibility for relevant NGA networks under a prior contract.  As reported to Percipient's CEO by the Associate Director of Analytics and senior operational analyst in the Outpost Valley

office, CACI "dragged its feet" and placed "roadblocks" in the way of deploying the software thereby delaying its availability by months.  Then, NGA headquarters closed the Outpost Valley office and reassigned its personnel.  This closure thwarted the real-world deployment of Mirage in a manner that would have demonstrated its capabilities and that (even prior to any award) would have undermined any justification for CACI to develop software to meet SAFFIRE's CV System requirements.

### C. Following the award of the SAFFIRE contract to CACI, NGA represented that CACI would evaluate commercial and nondevelopmental items prior to developing any new software to meet SAFFIRE's requirements.

86.    Once CACI became the SAFFIRE awardee, Percipient sought to have its software evaluated by CACI, while also communicating with NGA that NGA would need to stay involved to ensure a full and fair evaluation.

87.    On January 14, 2021, NGA awarded the SAFFIRE contract to CACI (award number HM0476-21-D-0004).  CACI is an established government contractor with experience in network engineering.  Further, it was the incumbent contractor who had managed critical parts of NGA's network.  It therefore was arguably well-suited to address the parts of the SAFFIRE procurement that required building and development—*i.e.*, the SOM Enterprise Repository part of the requirements.

88.    None of these qualifications, however, equipped CACI to develop a CV System on its own, particularly once it was made aware of software that already met SAFFIRE's CV System requirements.  At the same time, CACI was economically incentivized to develop the CV System rather than acquire it as a commercial or nondevelopmental item.  As a result, Percipient repeatedly cautioned that NGA would have to take an active role in evaluating nondevelopmental and commercial items, and that CACI could not be trusted to do so given its

34

conflict of interest.  For nearly a year, however, NGA sought to maintain the pretense that both

NGA and CACI were committed to acquiring commercial items to meet SAFFIRE's

requirements and gave CACI free rein to decide whether or not to incorporate commercial or

nondevelopmental items.  It was forced to abandon this pretense as to CACI only when CACI's

program manager specifically told Percipient that CACI itself intended to develop the CV

System.

89.    Percipient's efforts to secure an evaluation of its product from CACI began on

January 15, 2021, as soon as the awardee was announced, with an email from Percipient's Co-

Founder and CEO Balan Ayyar to NGA's Innovation and Industry Lead and its Computer Vision

Lead.  The email requested a commercial evaluation of Mirage before NGA or CACI began any

effort to develop its own AI software.  The Computer Vision Lead had expressed support and

enthusiasm for Mirage in her previous position as Associate Director of Analytics for the

Outpost Valley office, but she was on an extended leave before ultimately leaving the agency.

NGA's Innovation and Industry Lead did not respond.  As this and other episodes illustrated,

different officials within NGA had conflicting attitudes and levels of commitment towards the

importance of complying with the statutory preference for commercial and nondevelopmental

items.

90.    On January 27, 2021, the day NGA published a contract award notice identifying

CACI as the prime contractor, Mr. Ayyar sent a second email to NGA's Innovation and Industry

Lead and its Computer Vision Lead.  The email requested an introduction to its contractor for the

purpose of conducting an evaluation of Mirage.  Mr. Ayyar did not receive a response.

91.    Former NGA Director, Robert Cardillo, recommended that Mr. Ayyar contact

Phillip Chudoba, NGA's Associate Director of Capabilities.  Mr. Ayyar sent Mr. Chudoba an

email on February 5, 2021 explaining, among other things, that the "Mirage Geo Spatial module software exceeds the user requirements contained in the recent SAFFIRE solicitation for computer vision capabilities supporting NGA's analysts and important missions." He alluded to NGA's prior work with Mirage and how well received it was, and he explained that in addition to being legally required, using commercial software would save hundreds of millions of dollars, allow immediate mission impact potentially years ahead of government developed software, and leverage the private sector's expertise at managing risk. He also requested a meeting to discuss why NGA appeared to be "pursuing the development of government software without a thorough test and evaluation process of commercially available software."

92.     Twelve days later, on February 17, 2021, Mr. Chudoba responded, "please consider contacting the awardee (CACI) for SAFFIRE for their evaluation of your product."

93.     Through a mutual acquaintance, Mr. Ayyar then contacted the head of CACI's capture team, Don Paul Rance. On March 3, 2021, the two had a call to discuss the procurement. Mr. Rance was willing and indeed eager to discuss partnering with Percipient on other ventures. However, with no encouragement from NGA, he was unsurprisingly unwilling to engage in any such discussion with respect to SAFFIRE—where CACI would be paid potentially hundreds of millions of dollars to develop less advanced versions of the very capabilities that Mirage had already developed. When Mr. Ayyar requested on the call that CACI evaluate Mirage before beginning work on a government solution, Mr. Rance responded, "That ship has sailed."

94.     Understandably concerned by this blithe dismissal, on March 10, 2021, Percipient wrote NGA a letter conveying, *inter alia*, Percipient's understanding that NGA and its contractor were proceeding to develop software under the SAFFIRE procurement without having taken the appropriate steps to ensure that the appropriate market research is conducted, and without

incorporating commercial items into SAFFIRE to the maximum extent practicable. *See* Exhibit 1.

95.     In that same letter, Percipient reiterated that Mirage can meet and exceed SAFFIRE's CV System requirements, and requested that NGA, at a minimum, conduct—or ensure that its contractor conducts—a full and fair evaluation of the capabilities of Mirage and any other available commercial items that its market research determines could potentially meet some or all of SAFFIRE's CV System requirements. *Id.* at 8-12.  Further, given its contractor's evident bias for development, the letter also requested that, if its contractor conducts the evaluation and claims it is impractical to use commercial items, NGA independently evaluate its reasons after giving Percipient (and any other developer whose software is considered) an opportunity to address its contractor's reasons. *Id.* at 16.

96.     NGA responded via letter on March 30, 2021, stating that it "values companies providing innovative commercial solutions for geospatial-intelligence and actively seeks to partner with them, both to meet legal requirements and to ensure that NGA employs the best available technology to meet its mission." *See* Exhibit 2 at 1.

97.     The letter continued, "As to the integration of commercial solutions into SAFFIRE, there will be opportunities for percipient.ai and other commercial vendors to submit their products for review." *Id.*  NGA explained that it would "implement this process through numerous Performance Work Statement requirements for CACI to leverage commercial technology, conduct test and evaluation activities, employ a modular open systems architecture, and otherwise support the integration of commercial technology." *Id.*  CACI had purportedly "assured NGA that it will consider commercial products prior to developing new software." *Id.*

98.     NGA also stated, "CACI began its transition to the SAFFIRE contract less than 60 days ago and is still in that phase of performance."  *Id.*  Because "transition of existing capabilities is its top priority," CACI would only begin "engaging commercial vendors to evaluate their capabilities" once it had completed that transition.  *Id.*  It also stated, "Specific to percipient.ai, CACI estimates that engagement will take place in April 2021."  *Id.*  NGA concluded by directing Percipient to contact Brian Binder, the SAFFIRE program manager at CACI.

99.     Percipient and NGA had a call on April 1, 2021 to discuss NGA's response, with associate general counsel Jill O'Connor, advising attorney for the SAFFIRE procurement Major Jason A. Quinn, and Deputy Director of the Office of Contract Services Dea Merchant attending on NGA's behalf.

100.     During this call, NGA committed to a fair evaluation of commercial technologies for the SAFFIRE procurement.  Ms. O'Connor characterized Mr. Rance's "that ship has sailed" comment as an "unfortunate miscommunication" that did not reflect NGA and CACI's position. She stated that Mr. Rance was part of CACI's business development team, which was why NGA directed Percipient to instead contact Mr. Binder as the SAFFIRE program manager.  When asked about SAFFIRE's "transition" process, Ms. O'Connor stated that it meant a "couple things," to include onboarding contract employees, evaluating existing capabilities, and making decisions about replacing and retiring certain technologies.  She also agreed that no decision had been made as to whether Percipient's Mirage platform or other commercial products could replace Watchman, a legacy platform.

101.     Percipient's counsel repeated its request for a fair evaluation of commercial technologies and noted CACI's economic incentive to design, develop, and build a new software

product for which it would be paid.  Ms. O'Connor stated that NGA could not commit to a particular evaluative process, but she assured Percipient's counsel that CACI had developed a selection process and that NGA believed it would be implemented fairly.

102.    The next day, on April 2, 2021, Mr. Ayyar reached out to Mr. Binder at CACI to "continue the engagement with NGA on our Mirage platform and its GeoSpatial Module as you evaluate commercial products that NGA could leverage forward in its efforts to operationalize human and machine teaming in a way that takes hold and transforms the Agency."  Mr. Ayyar offered to "demo, discuss, provide training, and then deploy Mirage to your NGA team for a robust test and evaluation of the commercial software to gauge how far ahead NGA would be by the incorporation of Mirage into this important transformational undertaking."  Mr. Ayyar also offered to provide input on the evaluative process for the purpose of measuring Mirage's "array of capabilities and ability to satisfy NGA's needs, including advancing the efficacy of the human and machine team."  Mr. Ayyar concluded with a request to set up an introductory meeting with CACI's SAFFIRE team.

103.    Mr. Binder responded on April 6, 2021, without providing meaningful insight into CACI's evaluative process: "You may have heard that we were strongly focused on transition of legacy systems in the beginning stages of SAFFIRE.  While this activity continues in April, we look forward to getting a demo of your capabilities soon."

104.    On April 9, 2021, Percipient sent a follow-up letter to NGA, confirming Percipient's understanding from the April call and emphasizing that NGA should take affirmative steps to stay involved in the evaluative process.  *See* Exhibit 3.  Percipient also warned that any process for "evaluating algorithms or models that would run on the platform once developed" would not constitute a meaningful evaluation of Mirage's ability to meet "SDP,

CVI, and CVP requirements." *Id.* at 2.  Such a process would also fail to address "Mirage's ability to meet and exceed such requirements years ahead of schedule, thereby avoiding years of unnecessary delay and the uncertainties and cost of years of software development." *Id.*

105.    In response, Ms. O'Connor stated, "Thank you for your response; we will certainly continue to keep in touch as things progress."  Exhibit 5 at 3.

106.    Although NGA had previously stated its expectation that the evaluative process would begin in April, its contractor did not schedule an initial demonstration until May 27, 2021, a delay that its contractor attributed to a lengthier than expected transition period.

> **D.    CACI has repeatedly failed to conduct the necessary evaluation to determine Mirage's ability to meet SAFFIRE's CV System requirements.**

107.    CACI's attendees at the May 27, 2021 demonstration included Mr. Binder, Deputy Program Manager Travis Baumgart, Technical Innovation Director Alan Donaldson, Director of Engineering A.J. Arango, Director of Artificial Intelligence Jasen Halmes, Solutions Architect James Finnessy, and Taylor Chatt.  Mr. Binder, however, left after 20 minutes.  A Contracting Officer's Representative from NGA also attended, but no NGA analysts attended or participated in this demonstration.

108.    The feedback Percipient received from its contractor's team was highly positive. Mr. Baumgart stated that CACI should do a more technical "deep dive" into Mirage and suggested bringing together "brilliant people on both ends," meaning NGA analysts and the software engineers.

109.    The deep dive, however, never occurred.  Following this initial demonstration, Mr. Ayyar sent several follow-up emails to Messrs. Binder and Baumgart regarding a full evaluation of Mirage.  On June 11, 2021, Mr. Ayyar informed the program manager that Percipient was "delighted to help in any way on the discussion with NGA for an evaluation of

Mirage that will create a clear picture of how far ahead NGA could be today as an enterprise with the use of this commercial software." Mr. Binder replied on June 16, 2021, stating, "Thanks for reaching out. We will let you know when we need some help or have questions."

110.    Mr. Ayyar followed up again on July 6, 2021, to confirm that "NGA (through CACI) intends to evaluate our commercial software as part of their process before beginning development on potential GOTS solutions towards the same ends" and that CACI and Percipient were on "track" to "evaluate Mirage as a commercial alternative for the CVP, SDP and CVI requirements." On July 8, 2021, Mr. Binder stated that he would "discuss it with NGA soonest – hopefully tomorrow."

111.    A week later, on July 15, 2021, Mr. Binder informed Mr. Ayyar that his "Government Program Manager is on leave." Mr. Binder promised that "[o]ne of us will get back to you after she gets back next week, and we have a chance to talk further." Mr. Ayyar wrote back that same day, stating, "If you are not aware of this go forward strategy to evaluate commercial alternatives then I think we may have to communicate with NGA leadership directly but I'll confirm as well and let you know."

112.    On July 23, 2021, Mr. Binder confirmed that "SAFFIRE has a process to evaluate COTS and GOTS products." ("COTS" stands for "Commercial Off The Shelf" products, and "GOTS" stands for "Government Off The Shelf" products; the definition of commercial and nondevelopmental items under § 3453 is broader than these definitions). Mr. Binder further stated that "NGA asked us to compile our initial evaluation of your COTS" and that CACI "will be providing recommendations and insights to government soon." Mr. Ayyar thanked Mr. Binder for the update and asked for CACI to let him know how Percipient could assist with the

evaluation, assuming "this evaluation will come before your recommendations to NGA (as regards its capabilities)."

113.    After this July 23, 2021 email exchange, CACI went silent.  Mr. Ayyar checked in again on August 12, 2021 and received no response from Mr. Binder regarding an evaluation of Mirage.

114.    Percipient wrote another letter to NGA on September 1, 2021 to confirm that NGA remained committed to evaluating commercial products, to seek clarification of NGA and CACI's intended process for that evaluation, and to confirm that NGA and its contractor would not develop products to meet SAFFIRE's requirements without first conducting such an evaluation.  *See* Exhibit 4.

115.    NGA counsel responded on September 7, 2021 that NGA had received CACI's "evaluation" of Mirage but that "due to multiple competing priorities, NGA has not had an opportunity to complete its review of CACI's evaluation of Percipient's Mirage software, or determine next steps with regard to Mirage."  Exhibit 5 at 1.  She further stated that funding uncertainty could delay actions with respect to Mirage and asked for Percipient's "continued patience."  *Id.*

**E.    After CACI representatives informed Percipient that CACI intended to build a new CV System as a developmental project, NGA's Associate Director of Capabilities agreed to a demo of Mirage while asking Percipient to "ease up on the legal pressure."**

116.    One month later, a team from Percipient attended and participated in the GEOINT Symposium from October 5-8, 2021, in St. Louis, Missouri.  Mr. Binder stopped by Percipient's booth for a demonstration of Mirage's latest capabilities.  During that demonstration, he informed Percipient's team that CACI intended to build software to meet SAFFIRE's enterprise

requirements.  Mr. Ayyar later confirmed CACI's decision with Mr. Binder's team in a follow-up meeting.

117.    Mr. Ayyar discussed this development with NGA's Associate Director of Capabilities Phillip Chudoba on October 8, 2021.  Speaking at a panel on NGA's Moonshot Labs, Mr. Chudoba represented that the agency intended to evaluate commercial alternatives before building government software solutions.  Mr. Ayyar approached Mr. Chudoba after the panel discussion, told him what CACI's representatives had said, and requested the opportunity to demonstrate Mirage's capabilities to meet SAFFIRE's CV System requirements.  Considering the stated intention of NGA's contractor CACI to proceed with software development as well as its economic incentives to undertake such development, Mr. Ayyar also stated that he did not believe that its contractor could objectively evaluate Mirage's computer vision capabilities.

118.    In response, Mr. Chudoba agreed to set up a demonstration at NGA's Moonshot Labs.  He also asked that Percipient "ease up on the legal pressure."  Based on this conversation and Mr. Chudoba's public comments at the panel, Percipient believed at the time that NGA took its legal obligations under 10 U.S.C. § 3453 seriously and intended to conduct a full and fair evaluation of Mirage's computer vision capabilities and ability to meet SAFFIRE's CV System requirements.  Subsequent events showed otherwise.

**F.    Following the Mirage demo, NGA's Associate Director of Capabilities acknowledged that Mirage "meets all of NGA's analytic transformation requirements" and committed to conducting a fuller evaluation of its capabilities.**

119.    Percipient conducted a demonstration at NGA's Moonshot Labs on December 1, 2021.  Mr. Chudoba, along with NGA's General Counsel, Deputy Component Acquisition Executive, Director and Deputy Director for Data and Digital Innovation (DDI), and Chief

Technology Officer, attended the demonstration of Mirage's geospatial module and computer vision capabilities.

120.    In the resulting discussion, Mr. Chudoba stated that Mirage "meets all of NGA's analytic transformation requirements."  Percipient subsequently offered to set up an evaluation of Mirage with real world Russian and Ukrainian data, to which Mr. Chudoba agreed, leaving his team to coordinate.

121.    Over the next several months, Percipient and representatives from NGA's Office of Contract Services discussed implementation of the evaluation.  Percipient submitted its formal proposal on March 16, 2022.

122.    At no cost to the agency, Percipient offered to license Mirage's geospatial module for "12 to 20 NGA analysts (as decided upon by NGA) in an agreed upon area of the world (Russia/Ukraine) for the duration of the evaluation."  Percipient stated its intent "to allow NGA to evaluate the Mirage product" and provided that the "Mirage product will demonstrate differentiating capabilities including new model creation, integrated incremental learning, alerting, collaboration, and enterprise intelligence in order to arm the NGA team with a decisive intelligence edge."

123.    After three more weeks of negotiations, Percipient signed and returned a draft bailment agreement on April 6, 2022 to "test and evaluate Mirage platform Geospatial Module (GSM) capabilities."  The bailed property included Mirage's geospatial module, with defined features such as "automated learning for detectors and models, to include alerting for change detection and tipping and cueing, the ability to create, deploy and constantly strengthen new models while performing core missions, increasing productivity and collaboration."  NGA would

44

support the evaluation by providing "commercial unclassified data in a mutually-agreed upon area of the world."

124.    The testing period was set to begin on June 1, 2022 and extend for twelve weeks, allowing four weeks for account set up and eight weeks for the actual evaluation.  Percipient expected NGA to upload the agreed-upon testing data before June 1, 2022 and worked to facilitate that process.

**G.    After Percipient devoted more than $1 million in time and resources to the effort, NGA and CACI failed to evaluate Mirage's ability to meet SAFFIRE's CV System requirements, and declined to conduct any further evaluation.**

125.    However, right before it signed the bailment agreement, NGA walked back its promise to "provide commercial unclassified data in a mutually-agreed upon area of the world." On May 9, 2022, NGA's representative stated for the first time that there were "legal and security approvals associated with releasing NGA data which would add to the complexity and timeline."  She also claimed that NGA wanted to "use a standard set of data" to "enable other product evaluations."

126.    NGA's representative stated that NGA would only provide "XView – previously public released NGA Overhead Imagery" and "Spacenet – publicly available Overhead Imagery."  But as Mr. Ayyar explained in an email the next day, the XView and Spacenet datasets were not relevant testing data for the purposes of evaluating Mirage's geospatial module.  Instead, the XView and Spacenet datasets are limited to images taken years ago of common objects such as buildings and utility trucks.  These images are unrelated to any actual mission.  Nor would this backwards-looking data allow NGA analysts to test Mirage's computer vision capabilities, such as creating alerts to track changes in geographic areas over time.  Mr.

Ayyar reminded NGA that when it had previously licensed Mirage's geospatial module, NGA had used data from Russia and Ukraine.

127.    NGA's representative responded on May 12, 2022, stating that DDI intended to "do a standardized, repeatable, evaluation of all ML-Ops platforms which they are asked to assess." Without any more explanation, she stated that DDI felt that "the two datasets identified, XView and Spacenet, meet this need and will be more than sufficient to evaluate ML-Ops platforms offerings, to include Percipient.AI."

128.    A machine learning operations (ML-Ops) platform allows users to deploy, monitor, and improve machine learned models, but it does not provide for other capabilities that analysts use to accelerate their understanding of a location over time as the SAFFIRE project requires and Mirage provides. By only evaluating Mirage as an ML-Ops platform, NGA would not be evaluating all the other analytical tools that met SAFFIRE's CV System requirements. It would not address, for example, the SOM Data Production requirements that the SAFFIRE Statement of Requirements refers to as providing "the primary user experience for producing imagery-derived structured data." It further omitted Mirage's enormous CV Processing capabilities, including processing speeds that already exceeded SAFFIRE's requirements. NGA also ignored that Mirage is specifically designed to integrate with ML-Ops platforms, whether developed by Percipient or other software providers.

129.    Mr. Ayyar explained that it made no sense to evaluate Mirage as a mere "ML-Ops platform" and that the intent "in offering no cost licensing, no cost processing and a secure environment was to have NGA analysts use the software as it was intended and confirm whether it substantially meets or exceeds all NGA's analytic workflow transformation and computer vision goals."

130.    NGA's representative did not respond for over two weeks, finally writing on May 31, 2022—the day before the testing period was supposed to commence—that NGA "is continuing to discuss release of mission data" and "still working through details and don't have closure yet." Mr. Ayyar followed up with NGA's representative on June 14 to confirm that Percipient was ready to move quickly and prepare for a July 1, 2022 evaluation start date.

131.    NGA ultimately decided to provide the geospatial Russia and Ukraine data as initially agreed, but its failure to timely upload the relevant data caused a four-week delay in the schedule. On June 23, 2022, NGA revised the draft bailment agreement to add language protecting NGA's rights to the uploaded data. Mr. Ayyar accepted NGA's changes on June 27, 2022, reiterating the intent that NGA "use our Russian Order of Battle model (that was demoed live to Mr. Chudoba) to evaluate the Mirage platform and its automatic learning in detectors and models in a real area of conflict against NGA's enterprise CV analytical requirements." NGA and Percipient executed the bailment agreement on July 25, 2022.

132.    Percipient spent considerable time and resources to facilitate NGA's evaluation. It hosted two in-person training sessions, one on July 27 and another on September 7, 2022. It offered a technical deep dive on August 4, 2022. Throughout this period, Percipient also provided secure cloud services and account access—all training and related services, at no cost to NGA. The testing period concluded on October 23, 2022.

133.    The evaluation and NGA's subsequent conduct and statements as to its purpose confirmed that NGA did not evaluate Mirage's ability to meet SAFFIRE's CV System requirements and that it has no intention to do so in the future. NGA uploaded data slowly throughout the testing period, with the last upload occurring just 12 days prior to its conclusion.

Mirage only logged four instances of an NGA analyst using Mirage to run searches over the twelve-week testing period.

134.    The evaluation was therefore not reasonably calculated to evaluate the product and its panoply of advanced features, which include:

- customizable alerting features that analyze data automatically and notify users when objects, patterns, or changes are detected;

- "geofencing" features that allow users to focus on and analyze particular areas within a map or visual area and analyze them over time;

- "incremental learning" features that enable models to learn from and be trained by users;

- model-creating features using so-called "low shot learning" techniques, allowing users to create new models with very little training data;

- and collaborative report-building features that allow users to quickly and efficiently correlate data.

135.    Mr. Ayyar twice offered, on October 31 and November 15, 2022, to extend the testing period to allow for a more robust evaluation.  Given the "time it took to deposit the commercial data," Mr. Ayyar first proposed that NGA continue to validate and test Mirage "as we've agreed" until December 1, 2022.  Mr. Chudoba responded on November 1, 2022, stating that he had "asked my team for a status update on our evaluation efforts, and expect to gain additional insight in the next few days."

136.    NGA failed to provide the promised update, and Mr. Ayyar followed up with Mr. Chudoba on November 15, 2022, informing him that Percipient had "kept the secure cloud instance of Mirage up and running these past two weeks (approaching four months total) with the hope that your intent to evaluate the Mirage software was still valid and would materialize but with the holidays approaching, my sense is, even with an extension to the 1st of Dec that we offered, we do not have enough time to execute an evaluation that was intended to last 8 weeks

(planned completion was the 23rd of Oct 22)." Mr. Ayyar offered to set up a time to further

discuss NGA's evaluation of commercial alternatives.

137.    On November 23, 2022, NGA's representative responded on Mr. Chudoba's

behalf. Her response stated that the evaluation addressed "NGA's operational needs for an

enterprise Machine Learning (ML) Platform as identified by DDI" and that it "was not an

evaluation of the ML models generated and inferenced in Mirage, *nor of Mirage as an Analytic*

*tool*" (emphasis added). Given that SAFFIRE's central component is a CV System that would

provide users with advanced analytic capabilities, this response confirmed that NGA had

deliberately failed to evaluate Mirage's ability to meet SAFFIRE's CV System requirements, and

thus deliberately failed to conduct the evaluation necessary to determine whether Mirage could

serve as an alternative to development of SAFFIRE's CV System.

138.    Additionally, NGA's representative confirmed that there would be no broader

evaluation and specifically rejected Mr. Ayyar's efforts to extend the testing period:

> As noted in the Bailment Agreement, testing and evaluating existing products
> assists NGA in developing and describing future agency requirements by increasing
> awareness of the current state of technology. In order to maintain our edge against
> our nation's strategic adversaries, NGA places fundamental importance on looking
> across industry before developing acquisition strategies or building a total
> government software solution. In the coming months, we expect there will be
> opportunities for companies to competitively offer the agency AI/ML solutions.
>
> Thank you for the opportunity to test your software and for your offer to extend the
> Bailment Agreement. We believe we have done a thorough assessment on the
> original timeline, and an extension will not be necessary.

139.    Further, even this limited evaluation supported the conclusion that Mirage could

serve as the core CV System platform and echoed Mr. Chudoba's earlier recognition that Mirage

"meets all of NGA's analytic transformation requirements." NGA's representative stated that

"Mirage is a well-designed and capable UI, that the user's ability to label data was intuitive, and

the workflow learning curve was short." NGA's testers concluded that "Percipient's commercial

capability performed as described in meetings, correspondence, and in the documentation provided to support the assessment." Given that Percipient had repeatedly emphasized Mirage's ability to meet all of SAFFIRE's enterprise computer vision requirements in all meetings and correspondence with NGA, this statement would appear to have acknowledged its ability to do so.

140. At the same time, NGA was stating that it had not used the evaluation period to test Mirage for its intended purpose and ability to meet SAFFIRE's CV System requirements. That failure to conduct a complete evaluation for SAFFIRE's CV System was also reflected in the vague and evasive assertion of NGA's representative that "there are specific operational needs that Mirage does not meet, which would have to be addressed to further enable NGA's AI/ML capabilities." This statement failed to specify what "operational needs" Mirage "does not meet" and failed to reference the requirements of SAFFIRE, instead referring to "NGA's AI/ML capabilities." It specifically failed to address Mirage's ability to serve as the core CV System platform. It ignored that Mirage can readily integrate third-party models through its extensible architecture, and that it provides state-of-the-art tools for improving and testing those models as well as tools for using, analyzing, processing and visualizing their output. And it ignored that 10 U.S.C. § 3453(c)(2)(B)-(C) requires NGA to determine whether Mirage "could be modified to meet the agency's requirements" or "could meet the agency's requirements if those requirements were modified to a reasonable extent."

141. NGA's contractor also has been advertising multiple positions to build the very same tools that currently exist in Percipient's Mirage geospatial module. For example, on November 29, 2022, it filled a position for a "GIS [Geographic Information Systems] Subject Matter Expert" to "work with talented engineering and development teams building next

generation GIS analysis tools, while supporting an ever-evolving mission." The announcement further stated that the "GIS Subject Matter Expert will work with the Analysis GIS development and O&S teams to ensure that both current and next-generation GIS tools developed and managed by SAFFIRE are top notch." These recent job postings, along with other postings for software engineers and software integrators, confirm that its contractor is poised to spend years trying to develop geospatial computer vision software, at great expense and with uncertain results, even though Percipient has already developed a software platform that meets (or exceeds) all of SAFFIRE's requirements for a CV System.

142.    The actions and statements of NGA and its contractor since Percipient's initial correspondence have ultimately made clear that NGA is allowing CACI to proceed with building software to meet SAFFIRE's CV System requirements even though (i) it understands that Mirage either meets or likely exceeds SAFFIRE's requirements for a CV System, and (ii) to the extent that NGA claims it needs additional information to confirm that Mirage meets SAFFIRE's CV System requirements, it and CACI are refusing to conduct the research necessary to make those determinations as required by 10 U.S.C. § 3453.

**H.    In January 2023, NGA confirmed that it had no intention of requiring CACI to license Mirage or other commercial or nondevelopmental items, or to conduct any evaluation necessary to determine the ability of such items to meet SAFFIRE's CV System requirements.**

143.    On December 9, 2022, Percipient sent a letter to NGA regarding its failure to acquire or evaluate commercially available computer vision software for the SAFFIRE procurement. *See* Exhibit 6. Percipient's letter reiterated the background and explained that NGA's contractor is wastefully seeking to develop software from scratch even though such software already exists in a form that meets the CV System's requirements. *Id.* at 1-3. It emphasized that Percipient continues to augment Mirage's capabilities on a daily basis, with the

support of its leaders in the geospatial and computer vision field. *Id.* at 9. The benefits of Mirage can be further seen by the fact that U.S. intelligence agencies chose to license Percipient's software to meet such requirements in lieu of development and are making significant use of it. *Id.* Percipient uses the feedback it receives to constantly update, augment, and tailor its capabilities to the intelligence missions of the country's flagship agencies. *Id.*

144.    Percipient concluded its letter by asking that NGA comply with its obligations under § 3453 by directing its contractor to incorporate Percipient's Mirage platform in meeting SAFFIRE's computer vision software requirements or, to the extent that it requires additional information to confirm its ability to do so, "by agreeing to conduct a full and fair evaluation of Mirage's geospatial module along with any other commercial or nondevelopmental software that NGA believes could potentially meet SAFFIRE's requirements." *Id.* at 9. Percipient requested a response by December 22, 2022, and stated that absent agreement to these steps, it would be forced to file suit. *Id.* at 10.

145.    On December 22, 2022, NGA counsel stated that NGA was in receipt of Percipient's letter and that NGA would "substantively respond no later than January 13, 2023." Given Percipient's past efforts to secure NGA's compliance with its legal obligations, Percipient's counsel rejected NGA's continued delay and avoidance strategy. Instead, on December 26, 2022, Percipient's counsel reiterated its demand that NGA either commit to engage in licensing discussions or to conduct any further market research and evaluation of Mirage or other commercial or nondevelopmental items that NGA claims is necessary.

146.    NGA counsel then responded on January 3, 2023 with a short, four-paragraph letter. *See* Exhibit 7. Rather than meaningfully address the substantive points made in Percipient's letter, NGA primarily raised meritless procedural defenses it apparently plans to

assert in this litigation to avoid any review of its conduct.  Specifically, it asserts that 10 U.S.C. §
3453 cannot be enforced by Percipient because it was not a bidder on the original SAFFIRE
solicitation and because § 3453 does not create an "independent right of action."  *Id.* at 1.  The
former ignores Plaintiff's claim and allegations, including that it does not challenge the
solicitation but rather challenges NGA's post-award violations of § 3453 and related laws and
regulations.  It further ignores Percipient's detailed demonstration that would likely be awarded a
contract for the CV System if NGA were to comply with its duties under § 3453.  Likewise,
NGA's argument that § 3453 does not give rise to an "independent cause of action" ignores,
among other things, the Federal Circuit's decision in *Palantir v. United States*, 904 F.3d 980
(Fed. Cir. 2018), affirming an earlier decision of this Court enforcing 10 U.S.C. § 3453 (then
numbered 10 U.S.C. § 2377).  In that case, the Court relied on § 3453 to enjoin a major
procurement by the Department of the Army that, as in this case, unlawfully sought to develop
intelligence software that could practicably be met with commercially available software.  *See
Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218 (2016).

147.    NGA's letter offers only a single conclusory sentence in response to Percipient's
allegations, and that sentence itself reflects its misunderstanding of its obligations under § 3453.
It claims that CACI "evaluated" Mirage, ignoring that § 3453 does not simply require an
evaluation in the abstract, but instead requires market research necessary to make the
determinations required by § 3453(c)(2).  Exhibit 7 at 2.  Further, those determinations are
required in order to ensure that commercial or nondevelopmental items are procured "to the
maximum extent practicable."  10 U.S.C. § 3453(b)(2).  CACI did not conduct such an
evaluation.  Further, the letter notably failed even to assert it would be impracticable to acquire
Mirage, much less identify any reason why that would be the case.  The letter likewise does not

dispute that Mirage (and potentially other commercial or nondevelopmental items) meet and exceed SAFFIRE's CV System requirements. Nor does it dispute that NGA and its contractor are both refusing to adopt Mirage as a solution to the CV System needs, and also are refusing to conduct any further evaluation they claim to be necessary to determine whether Mirage can meet those CV System needs. Nor does NGA's letter even assert it is impracticable to acquire commercial items to meet all of SAFFIRE's CV System requirements, much less identify a credible, supportable reason why that would be the case. The letter further ignores that CACI received only a demo, that it deliberately declined to conduct the steps that its own employees acknowledged to be the logical next step, and that NGA's demo resulted in its Associate Director of Capabilities stating, Mirage "meets all of NGA's analytic transformation requirements."

148.    The letter otherwise vaguely asserts that it "continues to evaluate and integrate commercial *and other solutions* to meet the requirements of the SAFFIRE procurement." Exhibit 7 at 2 (emphasis added). "Other solutions" could of course mean anything, including further, unnecessary *development* of software to meet requirements that Mirage can already meet. NGA therefore does not contend—even in conclusory fashion—that it is preferring or requiring its contractor to prefer commercial items to the maximum extent practicable as the law requires. Instead, it continues the evasiveness that has characterized its responses throughout, and ignores the fundamental point that Mirage is a fully developed product that can meet all of SAFFIRE's CV System requirements.

149.    Finally, the letter accuses Percipient of seeking to improperly interfere with a contract's administration by asking for an order that NGA order CACI to award Percipient a subcontract. Again, that is untrue. What Percipient seeks is NGA's compliance with its obligations under 10 U.S.C. § 3453 to ensure that it and its contractor CACI acquire commercial

or nondevelopmental items to meet its requirements "to the maximum extent practicable," and that they conduct whatever research or evaluation is necessary to make the determination as to what commercial or nondevelopmental items may exist to meet those requirements.  Percipient offers a product that can meet SAFFIRE's requirements, and NGA and CACI have offered no basis for claiming otherwise.  At the same time, CACI and NGA have refused to procure Mirage or any other commercial or nondevelopmental items to meet SAFFIRE's CV System requirements while also refusing to conduct any evaluation they claim is necessary to determine the ability of Mirage or any other commercial or nondevelopmental item to meet SAFFIRE's requirements.  If they claim further evaluation is necessary to determine its ability to do so, then § 3453 requires that they conduct that evaluation prior to developing new software.  And if, as is the case, there are commercial or nondevelopmental items (such as Mirage) that exist and that can practicably be acquired to meet NGA's CV System requirements, then § 3453 requires the use of such items to meet those requirements, rather than launching or permitting an effort to develop new software to meet those requirements.

150.    NGA's decision to permit development of software to meet SAFFIRE's requirements is unlawful, irrational, and harmful for multiple reasons.  NGA has failed to identify any reason why it would be impracticable to use Mirage to meet SAFFIRE's CV System requirements, and there is none.  Yet NGA is poised to pay a contractor hundreds of millions of dollars to develop critical computer vision software when state-of-the-art software already exists that was developed specifically for NGA by a team that boasts the top minds in the computer vision field and years of experience designing products used by more than a billion people around the world.  Moreover, NGA is allowing this decision to be dictated not by a comprehensive evaluation of Mirage's capabilities that NGA supervised but by a contractor with

little verifiable experience in computer vision product development and a staggeringly high economic incentive to choose a costly development effort over acquiring best-in-class software from the private sector.

151.    Moreover, even if its contractor could eventually develop a product of the quality that Mirage is now, the wasted resources would be unconscionable as would the delay in harnessing the technology's benefits during the period of time that its contractor is attempting to develop what already exists.  And given the improvements that Percipient makes every day in its product, attempting to replicate the advances that have already occurred guarantees that NGA will be even further behind the market by the time the software is developed.  There also is no basis for believing that its contractor *can* develop a product that even approaches Mirage's current sophistication, no matter how much time is taken.  Instead, there is every reason to believe it cannot, given that its contractor lacks the industry-leading experience of the Percipient team in computer vision and artificial intelligence.

152.    Finally, Percipient took a commendable path in doing what national security leadership has sought across multiple administrations—connecting Silicon Valley and venture capital with the needs of the nation.  It is in the national interest for private companies to take the risk of developing at private expense U.S. commercial software that would serve government missions ahead of their need without any prior commitment by the U.S. government.  Such efforts are precisely what § 3453 is meant to encourage and exactly what many of the previously cited reports have confirmed is the best path forward for the nation to meet its emerging national security challenges.   If the government is permitted to launch costly and uncertain new developmental products before even conducting a meaningful evaluation of products that already

exist, and if it is otherwise permitted to ignore commercial or nondevelopmental products that meet and even exceed its needs, it will discourage future such efforts.

153.    NGA is therefore violating the law, including 10 U.S.C. § 3453, 48 C.F.R. § 11.002(a)(2)(iv), and 48 CFR § 212.212.  Mirage is a commercial or nondevelopmental item that meets SAFFIRE's CV System requirements.  NGA failed to ensure that it and its contractor, to the maximum extent practicable, incorporate commercial or nondevelopmental items—like Mirage—into the SAFFIRE project. 10 U.S.C. § 3453(b)(1)-(2); 48 CFR § 11.002 (a)(2)(iv). Further, it failed to ensure that necessary "market research" was conducted as to the availability of commercial or nondevelopmental items to meet NGA's needs.  10 U.S.C. § 3453(c)(5); *see also id.* at § (c)(1)(C).  Both of these failures by NGA violate the law.  For similar reasons, NGA has violated 48 CFR § 212.212, which required it to "identify and evaluate, at all stages" of SAFFIRE, "opportunities for the use of commercial computer software and other non-developmental software in accordance with § 803 of the National Defense Authorization Act for Fiscal Year 2009 (Pub. L. 110-417)."  48 CFR § 212.212.

154.    In sum, NGA is making the very mistakes that 10 U.S.C. § 3453 was meant to prevent in a critical area where the country cannot afford such mistakes.  As Secretary of Defense Lloyd Austin agreed in his confirmation hearing while pledging to prioritize reform of the Department of Defense's acquisition process, the Department will "have to invest in the capabilities that will make us relevant, not in the last fight, but in the future fight," including "the use of AI."  C-SPAN, Defense Secretary Confirmation Hearing 2:00:17-01:03, 2:12:43-13:01 (Jan. 19, 2021).  The adoption of technology like AI "is not a choice" because it is an area in which "we must invest in going forward if we're going to maintain a competitive edge."  *Id.* at 2:00:17-01:03.

155.    Through its violations of 10 U.S.C. § 3453, NGA is unlawfully, irrationally, and arbitrarily undermining the country's competitive edge in an area of critical importance to national security.

### COUNT ONE
**NGA Is Violating 10 U.S.C. § 3453 And Related Regulations By Refusing To Ensure That Its Contractor For The Ongoing SAFFIRE Procurement Incorporates Commercial or Nondevelopmental Items To The Maximum Extent Practicable**

156.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

157.    NGA has violated, and will continue to violate, at least the following statute and regulations in connection with the SAFFIRE procurement:  10 U.S.C. § 3453; 48 C.F.R. § 11.002; and 48 C.F.R. § 212.212.

158.    A "procurement" includes all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with the contract completion and closeout.

159.    The SAFFIRE procurement is ongoing and years from completion:  it is an Indefinite Delivery, Indefinite Quantity (IDIQ) contract that NGA awarded to its contractor in or about January 2021.

160.    NGA has violated its legal obligation to ensure that the ongoing SAFFIRE procurement incorporates commercial or nondevelopmental items to the maximum extent practicable.

161.    Section 3453 and the above regulations require that NGA—throughout the SAFFIRE procurement—ensure "to the maximum extent practicable," the acquisition of commercial services, commercial products, or nondevelopmental items other than commercial products to meet the needs of the agency.  10 U.S.C. § 3453(b)(1).  NGA (including its

58

procurement officials) must also, "to the maximum extent practicable . . . require prime contractors and subcontractors at all levels under the agency contracts to incorporate commercial services, commercial products, or nondevelopmental items other than commercial products as components of items supplied to the agency."  10 U.S.C. § 3453(b)(2).

162.    Moreover, the DFAR requires that "Departments and agencies *shall* identify and evaluate, at all stages of the acquisition process (including concept refinement, concept decision and technology development), opportunities for the use of commercial computer software and other non-developmental software in accordance with § 803 of the National Defense Authorization Act for Fiscal Year 2009 (Pub. L. 110-417)."  48 CFR § 212.212 (emphasis added).

163.    SAFFIRE's Statement of Requirements requires an architecture that includes (a) an Enterprise Repository; and (b) a CV System.

164.    As explained above, Percipient has a commercial or nondevelopmental software platform, Mirage, that meets and exceeds SAFFIRE's CV System requirements—and that can be easily integrated into the Enterprise Repository required by SAFFIRE.

165.    Percipient has specifically requested on several occasions that NGA and SAFFIRE's contractor evaluate Mirage for integration into the SAFFIRE procurement, but both have refused to do so in favor of launching a developmental effort to develop much—if not all— of that capability over a period of years.  NGA therefore has failed to meet its obligation to ensure, to the maximum extent practicable, that its contractor incorporates commercial or nondevelopmental items to meet NGA's requirements as set forth in § 3453 and related regulations.

166.    NGA's failure also contradicts Congress' mandate in NDAA FY22 that the

Secretary of Defense "ensure that, to the maximum extent practicable, commercial artificial

intelligence companies are able to offer platforms, services, applications, and tools to

Department of Defense components through processes and procedures under part 12 of the

Federal Acquisition Regulation."  NDAA FY22 § 227(c).

167.    NGA's failure to comply with these provisions is irreparably harming Percipient

and the public interest by preventing acquisition and integration of its Mirage platform into the

SAFFIRE procurement in lieu of a wasteful development-oriented solution.  If NGA complies

with its legal obligations and conducts a full and fair evaluation of Mirage's capabilities, it and

its contractor will conclude—or at a minimum are substantially likely to conclude—that Mirage

can meet their CV System needs for SAFFIRE and should be incorporated into the SAFFIRE

procurement.

## COUNT TWO
**NGA Is Violating 10 U.S.C. § 3453 And Related Regulations By Refusing To Take Steps To Require Its Contractor To Engage In Market Research And Make Determinations As To Whether Its Needs Could Be Met By Commercial Or Nondevelopmental Items**

168.    The allegations of the preceding paragraphs are incorporated by reference as if

fully set forth herein.

169.    Under 10 U.S.C. § 3453(c)(1)(C) and (c)(5), the head of the agency must,

respectively, "conduct market research appropriate to the circumstances . . . before awarding a

task order or delivery order in excess of the simplified acquisition threshold," and "shall take

appropriate steps to ensure that any prime contractor of a contract (or task order or delivery

order) in an amount in excess of $5,000,000 for the procurement of products other

than commercial products or services other than commercial services engages in such market

research as may be necessary to carry out the requirements of subsection (b)(2) before making

purchases for or on behalf of the Department of Defense." As described above, subsection (b)(2) requires the head of NGA to the maximum extent practicable to ensure that procurement officials require CACI to incorporate commercial or nondevelopmental items in fulfilling its deliveries under SAFFIRE.

170. NGA has violated, and will continue to violate, at least 10 U.S.C. § 3453 by, among other things, failing to take appropriate steps to ensure that its contractor has engaged in such market research as may be necessary for NGA to comply with its requirements under § 3453(b)(2).

171. As explained above, Percipient has a commercial or nondevelopmental software platform, Mirage, that meets and exceeds SAFFIRE's CV System requirements—and that can be easily integrated into the enterprise backbone (SER) contemplated by SAFFIRE.

172. Percipient requested on several occasions that NGA and SAFFIRE's contractor evaluate Mirage for integration into the SAFFIRE procurement. Both, however, refused to do so, and instead plan to develop much—if not all—of that capability over a period of years. NGA therefore has failed to meet its obligation to ensure to the maximum extent practicable that its contractor incorporate commercial items to meet NGA's requirements as set forth in § 3453 and related regulations.

173. NGA's contractor failed to conduct the necessary market research before proceeding to launch an effort to develop the CV System component or components of SAFFIRE, and it will spend in excess of $5,000,000 on the procurement of products other than commercial products or services other than commercial services.

174. NGA's failure to follow § 3453 and related regulations is irreparably harming Percipient, including because Percipient has a commercial or nondevelopmental item (Mirage)

available for use in SAFFIRE that, if not considered, may be forever foreclosed from being integrated into the SAFFIRE architecture.  If the required market research is conducted, NGA and CACI will conclude—or at a minimum are substantially likely to conclude—that Mirage can practicably meet SAFFIRE's CV System requirements.

### COUNT THREE
### NGA Improperly Delegated Inherently Governmental Authority

175.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

176.    DFAR, Subpart 7.5 requires agencies to ensure that inherently governmental functions are not performed by contractors.  Included in those functions are:

(5) The determination of agency policy, such as determining the content and application of regulations, among other things.

(12) In Federal procurement activities with respect to prime contracts-

(i) Determining what supplies or services are to be acquired by the Government (although an agency may give contractors authority to acquire supplies at prices within specified ranges and subject to other reasonable conditions deemed appropriate by the agency).

DFAR §§ 7.503(5), (12)(i).

177.    NGA must ensure "to the maximum extent practicable" the acquisition of commercial services, commercial products, or nondevelopmental items other than commercial products to meet the needs of the agency.  10 U.S.C. § 3453(b)(1).

178.    NGA failed to ensure that the ongoing SAFFIRE procurement incorporates commercial or nondevelopmental items to the maximum extent practicable by, among other things, allowing its contractor to build software to meet SAFFIRE's computer vision software requirements before conducting the required market research.

179.    By these failures, NGA violated DFAR, Subpart 7.5, because it has allowed its contractor to develop computer vision software over acquiring commercial or nondevelopmental items, without requiring adherence to 10 U.S.C. § 3453.  In doing so, NGA has allowed its contractor to determine agency policy with regard to developing artificial intelligence technology and, thereby, has effectively delegated inherent governmental functions.  NGA's failures allowed its contractor to exercise its discretion in determining whether to acquire available, already-developed artificial intelligence technology from the private sector, contrary to federal law requiring that agencies incorporate commercial or nondevelopmental items "to the maximum extent practicable.".

180.    Because of the delegation to CACI of the inherently governmental function of determining agency policy with regard to nondevelopmental or commercial artificial intelligence technology, NGA has violated the referenced federal regulations restricting the delegation of inherently governmental authority.

181.    As a result of NGA's violations of law, Percipient has suffered damages, including the loss of an opportunity for the integration of its platform into the SAFFIRE procurement in lieu of a wasteful development-oriented solution.

## COUNT FOUR
**NGA Engaged In Arbitrary, Capricious, And Unlawful Conduct By Resisting Innovation, By Insisting On The Wasteful Approach Of Software Development, And By Engaging In Bad Faith Conduct**

182.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

183.    Under 28 U.S.C. § 1491(b)(4), this Court must set aside as unlawful any decision in connection with a procurement that violates the standards set forth in 5 U.S.C. § 706.  Section 706 provides that an agency action must be set aside if it is, among other things, "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A). As shown in each of the Counts set forth above, NGA's failure to ensure that its contractor incorporate commercial or nondevelopmental items and to conduct the appropriate market research violated numerous provisions of law, and hence was "not in accordance with law." In addition, and independent of all of those specific legal violations set forth in Counts One through Three, NGA's conduct was also arbitrary and capricious. This is an independent ground for setting aside NGA's decision, as provided for in § 706(2)(A).

184.    First, each of the legal violations described in each of the Counts above describes arbitrary and capricious action.

185.    Second, NGA's conduct is fundamentally irrational, arbitrary, and capricious because the NGA personnel in charge of the SAFFIRE procurement are well aware that Mirage either meets or likely meets its CV System requirements as reflected in the comments of NGA's Associate Director for Capabilities—specifically that Mirage "meets all of NGA's analytic transformation requirements." NGA, however, is deliberately failing to conduct whatever additional evaluation it claims to be necessary to confirm Mirage's ability to meet SAFFIRE's CV System requirements.

186.    Third, both Congress and the Secretary of Defense have exhorted and directed the Department of Defense components to encourage and seek out innovation, specifically in the area of artificial intelligence. This if anything requires still greater care and attention, yet NGA's conduct in this case does the opposite.

187.    Fourth, there is ample evidence of malicious, bad faith conduct toward Percipient. NGA, in the context of discussing Mirage's geospatial module, represented that the SAFFIRE procurement would "employ a modular open systems architecture" and "support the integration

of commercial technology." NGA also represented that CACI had a selection process in place to fairly evaluate commercial technology. After CACI failed to conduct the promised evaluation, NGA asked that Percipient "ease up on the legal pressure" and expressly committed to conducting an evaluation of Mirage's geospatial platform. Percipient spent over $1 million of time and resources in negotiating and implementing an agreement whose stated purpose was to allow NGA "to test and evaluate Mirage platform Geospatial Module (GSM) capabilities." NGA's promises proved to be a bait and switch, with NGA admitting months later that it had not evaluated "Mirage as an Analytic tool." When confronted with the flaws of its limited evaluation, NGA then falsely claimed that CACI had in fact evaluated Mirage. For NGA to string Percipient along for almost two years is bad faith conduct that reveals a deep-seated level of bias against Percipient and in favor of the incumbent defense contractor who has little experience in computer vision software development. Such bias is irrational, arbitrary, and capricious.

188.    Further, to the extent any evaluation by NGA or CACI purported to conclude that Mirage could not meet all of the requirements for SAFFIRE's CV System, or could not do so with minor modifications or modifications of the type that are customary in the commercial marketplace, any such finding or determination would be arbitrary and capricious. As alleged above, Mirage meets or exceeds the requirements of SAFFIRE's CV System.

189.    Accordingly, for all of the foregoing reasons and those set forth more thoroughly in the body of the Complaint, NGA's decision in connection with the procurement should be set aside as reflecting arbitrary and capricious agency conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Percipient respectfully requests that the Court:

A.      Find that NGA violated 10 U.S.C. § 3453 and related regulations by failing to ensure that its contractor, to the maximum extent practicable, incorporated commercial or nondevelopmental items, such as Percipient's Mirage platform, into the SAFFIRE procurement;

B.      Find that NGA violated 10 U.S.C. § 3453 and related regulations by failing to take appropriate steps to ensure that its contractor engage in the market research needed to determine whether Percipient's Mirage platform and other commercial or nondevelopmental items could meet some of SAFFIRE's requirements, including its requirements for a CV System;

C.      Enjoin NGA from violating 10 U.S.C. § 3453 and related regulations, and instruct NGA that in order to comply with the law it must ensure that (1) it and its contractor incorporate commercial products or nondevelopmental items in the SAFFIRE procurement, such as Mirage, to the maximum extent practicable; and (2) its contractor conducts market research necessary to determine the ability of Mirage and other commercial products and nondevelopmental items to practicably meet the requirements of the SAFFIRE procurement, including the CV System portion of that procurement.  To meet these requirements, it should be required at a minimum to (i) conduct, or require its contractor to conduct, an appropriate evaluation of the practicability of incorporating Mirage to meet the SAFFIRE requirements for a CV System, (ii) independently evaluate any determination made by its contractor, (iii) incorporate Mirage if it determines it is practicable to do so, (iv) if it or its contractor determines it is not practicable to do so, inform Percipient as to its reasons and give it the opportunity to respond; or (v) propose other equivalent steps for meeting its legal obligations;

D.      For an order awarding Plaintiff its reasonable attorneys' fees;

F.      Enter such other relief as the Court deems just and proper.

Respectfully Submitted,


By: s/ Samuel C. Kaplan
_____
Hamish P.M. Hume (Of Counsel)
Samuel C. Kaplan
Eric J. Maurer (Of Counsel)
Gina A. Rossman (Of Counsel) (*pro hac vice*
to be submitted)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave., NW
Washington, DC 20005
(202) 237-2727 (t)
(202) 237-6131 (f)
hhume@bsfllp.com
skaplan@bsfllp.com
emaurer@bsfllp.com
grossman@bsfllp.com

Dated: January 9, 2023                    *Counsel for Plaintiff Percipient.ai, Inc.*